KENNETH M. WEBSTER, ESQ.
Nevada Bar No. 7205
HALL PRANGLE & SCHOONVELD, LLC
777 North Rainbow Blvd., Suite 225
Las Vegas, Nevada, 89107
*(702) 889-6400 - Office*
*(702) 384-6025 - Facsimile*
*Attorneys for Summerlin Hospital*

UNITED STATES DISTRICT COURT,

DISTRICT OF NEVADA

| | |
|---|---|
| KATHLEEN SHINN and RICHARD SHINN, Individually, as Heirs and as Personal Co-Administrators of the Estate of ALYSSA SHINN, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>BAXA CORPORATION; MCKESSON CORPORATION, a Delaware Corporation; DOES 1 through 50, and ROE CORPORATIONS 1 through 20; | Case No.: 2:07-CV-01648-JCM-PAL<br><br>**SUMMERLIN HOSPITAL MEDICAL CENTER'S SUPPLMENT TO IT'S MOTION TO INTERVENE AND FOR DETERMINATION OF GOOD FAITH SETTLEMENT** |

COMES NOW SUMMERLIN HOSPITAL MEDICAL CENTER, LLC, d/b/a SUMMERLIN HOSPITAL MEDICAL CENTER (hereinafter referred to as "Summerlin Hospital"), by and through its counsel of record, of the law firm of HALL PRANGLE & SCHOONVELD, and files its Supplement to its request for an Order allowing Summerlin Hospital to Intervene and simultaneously an Order Granting Good Faith Settlement between Summerlin Hospital and Plaintiffs for the settlement reached between Plaintiffs and Summerlin Hospital.

## POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

On June 24, 2008 Baxa Corporation filed its Supplemental Response to Summerlin Hospital's Motion to Intervene and Motion for Determinaiton of Good Faith Settlement.  In that document Baxa alleges that Summerlin has thwarted their attempts to obtain documents "precluding Baxa from a fair and reasonable opportunity to challenge Summerlin's Motion".  See Supplement Page 8, lines 10-11.

### II.

### ARGUMENT

**A.      Summerlin Hospital has provided Baxa with the Excess Liability Indemnity Policy and is willing to provide an Affidavit regarding the self insured status of Summerlin Hospital.**

Counsel for Summerlin Hospital, Ken Webster, Esq., has been in trial in Utah for several weeks and in an attempt to provide Baxa with the information needed, David P. Ferrainolo, Esq., has stepped in to assist Mr. Webster and work with counsel for Baxa to provide the information needed.  See Affidavit of David P. Ferrainolo attached as Exhibit "A".

On June 19, 2008 counsel for Summerlin, David P. Ferrainolo, spoke with counsel for Baxa, Nicholas M. Wieczorek, Esq., and was informed that as a result of a potential settlement between Baxa and the Shinns, that Summerlin Hospital did not have to produce all of the documents identified by Baxa in their May 19, 2008 correspondence to Kenneth Webster, Esq., except for the insurance policy for Summerlin Hospital and/or Baxa, in effect during the period in question.  At that time, counsel for Summerlin explained that Summerlin Hospital was self insured and that there was no such insurance policy to produce.  Counsel for Summerlin Hospital

verified that fact with Universal Health Services, Inc., and relayed said information to Mr. Wieczorek via telephone conference.

Understanding that counsel for Baxa wanted something in the form of an insurance policy, counsel for Summerlin obtained a copy of the Excess Liability Indemnity Policy for Universal Health services, Inc., in effect at the time of the incident, and agreed to produce said policy to Baxa. On June 26, 2008 Baxa was hand delivered a copy of the Excess Liability Indemnity Policy for Universal Health services, Inc., which covers Summerlin Hospital. See Exhibit "B".

On June 26, 2008 counsel for Summerlin Hospital spoke to counsel for Baxa and explained that the policy being sent over was an excess policy and not the primary insurance policy as there is no such physical primary insurance policy. Counsel for Summerlin offered to have an Affidavit produced from Universal Health Services, Inc., reflecting the fact that Summerlin Hospital is self insured and as a result, no physical insurance policy exists. Counsel for Baxa indicated that said Affidavit was not necessary at this time, and as a result, no such Affidavit was prepared or produced.

As of June 26, 2008 counsel for Summerlin Hospital believes that it has provided counsel for Baxa with the documents discussed in the June 19, 2008 telephone conference.

## III.
## CONCLUSION

Based upon the forgoing, as well as the original moving papers, Summerlin Hospital respectfully requests their Motion to Intervene and their Motion for Determination of Good Faith

Settlement be granted and any and all claims for contribution and/or indemnity be forever barred.

DATED this 26th day of June, 2008.

HALL PRANGLE & SCHOONVELD, LLC

MICHAEL E. PRANGLE, ESQ.
Nevada Bar No. 8619
KENNETH M. WEBSTER, ESQ.
Nevada Bar No. 7205
HALL PRANGLE & SCHOONVELD, LLC
777 North Rainbow Blvd., Suite 225
Las Vegas, NV 89107
*Attorneys for Summerlin Hospital*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26 day of June, 2008 a true and correct copy of the foregoing SUMMERLIN HOSPITAL MEDICAL CENTER, LLC, d/b/a SUMMERLIN HOSPITAL MEDICAL CENTER'S SUPPLEMENT TO ITS' MOTION TO INTERVENE AND MOTION FOR DETERMINATION OF GOOD FAITH SETTLEMENT and was served via U.S. First-Class Mail, postage prepaid, addressed as follows:

Kerry L. Earley, Esq.
RICHARD HARRIS LAW FIRM
801 S. 4th St.
Las Vegas, NV 89101
*Counsel for Plaintiffs*

Nicholas M. Wieczorek, Esq.
MORRIS POLICH & PURDY, LLP
3930 Howard Hughes Pkwy, Ste. 360
Las Vegas, NV 89169
*Counsel for Defendant Baxa*

*An Employee of Hall Prangle & Schoonveld, LLC*

-4-

EXHIBIT __A__

1  MICHAEL E. PRANGLE, ESQ.
   Nevada Bar No. 8619
2  KENNETH M. WEBSTER, ESQ.
   Nevada Bar No. 7205
3  HALL PRANGLE & SCHOONVELD, LLC
   777 North Rainbow Blvd., Suite 225
4  Las Vegas, Nevada, 89107
   *(702) 889-6400 - Office*
5  *(702) 384-6025 - Facsimile*
6  *Attorneys for Summerlin Hospital*

7                 **UNITED STATES DISTRICT COURT**

8                        **DISTRICT OF NEVADA**

9

10 KATHLEEN SHINN and RICHARD SHINN,         Case No.: 2:07-CV-01648-JCM-PAL
   Individually, as Heirs and as Personal Co-
11 Administrators of the Estate of ALYSSA      **AFFIDAIVT OF DAVID P. FERRAINOLO**
   SHINN, Deceased,                            **IN SUPPORT OF SUMMERLIN**
12                                             **HOSPITAL MEDICAL CENTER'S**
13                      Plaintiff,             **SUPPLEMENT TO IT'S MOTION TO**
                                               **INTERVENE AND FOR**
14 vs.                                         **DETERMINATION OF GOOD FAITH**
                                               **SETTLEMENT**
15
   BAXA CORPORATION; MCKESSON
16 CORPORATION, a Delaware Corporation;
   DOES 1 through 50, and ROE
17 CORPORATIONS 1 through 20;
18

19 COUNTY OF CLARK        )
                          ) ss.
20 STATE OF NEVADA        )

21         DAVID P. FERRAINOLO, ESQ, being duly sworn, deposes and states:

22         1.      I am an attorney, duly licensed to practice law in the State of Nevada, with the

23 law firm of Hall, Prangle & Schoonveld, counsel of record for Summerlin Hospital in the above

24 referenced matter.  The following facts are personally known to me and if called upon as a

25 witness, I could and would competently testify to their accuracy.

26

27

28

                                          -1-

2.      On June 19, 2008 your Affiant spoke with Nicholas M. Wieczorek, Esq., counsel for Baxa and asked what documents he needed to be produced from the list in his May 19, 2008 correspondence to Mr. Webster.

3.      Counsel for Baxa told your Affiant that at this point Summerlin Hospital did not have to produce all the documents requested in his May 19, 2008 correspondence except for the insurance policy for Summerlin Hospital and/or Baxa in effect during the period in question.  See Exhibit "C" (letter from Ferrainolo to Wieczorek dated June 19, 2008)

4.      Your Affiant informed counsel for Baxa that Summerlin Hospital was self insured and that no primary insurance policy existed.

5.      On June 24, 2008, Your Affiant contacted Mr. Wieczorek and notified him that he had received documents from Universal Health Services, Inc., and would be producing them shortly.

6.      On June 26, 2008, Your Affiant produced to Mr. Wieczorek the Excess Liability Indemnity Policy via hand delivery.

7.      On June 26, 2008, Your Affiant confirmed that Summerlin Hospital was self insured and that no physical insurance policy existed evidencing that self insurance and could not be produced.

8.      On June 26, 2008, Your Affiant offered to have an Affidavit prepared by the Person Most Knowledgeable at Universal Health Services, Inc. showing that Summerlin Hospital was self insured and that no physical insurance policy exists evidencing that fact.

9.      Mr. Wieczorek instructed your Affiant that no such Affidavit was necessary at this point in the proceedings but may be necessary later.

10.     Your Affiant did not have an Affidavit prepared by the Person Most Knowledgable at Universal Health Services, Inc., and that Summerlin Hospital was self-insured and that no physical insurance policy exists evidencing that fact based on Mr. Wieczorek representation.

11.     Your Affiant believes that as of June 26, 2008 counsel for Baxa has everything he requested in the June 19, 2008 telephone conference.

FURTHER AFFIANT SAYETH NOT.

_____
AFFIANT

SWORN AND SUBSCRIBED BEFORE ME
on this the 26 day of June, 2008.

_____
Notary Public
in and for said County and State

Notary Public - State of Nevada
County of Clark
TAMIE PHILLIPS
My Appointment Expires
September 10, 2011
No. 03-84280-1

-3-

EXHIBIT __B__



Form MAX OCR-01

Policy No. 9810-1092-UMB-2006

## MAX RE LTD.

**Producer:**    Marsh Global Markets (Bermuda) Ltd.

**In favor of:**   Universal Health Services, Inc.

**Address:**    367 S. Gulph Road, King of Prussia
PA 19406
United States

**Type of Coverage:  EXCESS LIABILITY INDEMNITY POLICY**

in the amount as stated in Item 2 of the Declarations.

**Term:**    Beginning at 12:01 A.M. on the 1st day of **January** , 2006 with retroactive coverage, if applicable, from 12:01 A.M. on the **1st day of January** , 2006, in each case, prevailing time at the address of the Named Insured and in accordance with terms and conditions of the form(s) attached.

**PERIOD:**      January 1, 2006-January 1, 2007

**PREMIUM:**      ▬▬▬▬

IN WITNESS WHEREOF, this Policy has been made, entered into and executed by the undersigned in Hamilton, Bermuda this 11th day of December, 2006.

By: _Michael S. Morgan_

Michael S. Morgan

Title:  **Senior Vice President**

Policy No. 9810-1092-UMB-2006
Date : December 11, 2006

## EXCESS LIABILITY INDEMNITY POLICY
## INSURANCE DECLARATIONS

**Item 1**    (a)   **Named Insured:**        **Universal Health Services, Inc.**

(b)   Address of Named Insured:  **367 S. Gulph Road, King of Prussia**
**PA 19406**
**United States**

**Item 2**    Limits of Liability:

**(a)**

| Layer | Per Occurrence Limit | Per Occurrence Retention |
|-------|---------------------|--------------------------|
| 1 | 90% Part of $5,000,000 | $ 15,000,000 |

**(b)**    Annual Aggregate:        $4,500,000

**Item 3**    Policy Inception Date:*      January 1, 2006

First Annual Period Expiration Date:*  January 1, 2007

**Item 4**    Retroactive Coverage Date:*    January 1, 2006

**Item 5**    Representative of Named Insured:  **Universal Health Services, Inc.**

**Item 6**    Currency:

(a)   Premium:          **U.S. Dollars**
(b)   Claims:          **U.S. Dollars**

**Item 7**    Premium:          ▬▬▬▬▬

---

*    At 12:01 a.m. at the address of the Named Insured listed in Item 1(b) above.

-2-

**Item 8**    The Company:

(a)   All Notices of Occurrence:

Claims Department
Max Re Ltd.
Max Re House
2 Front St.
P.O. Box HM 2565
Hamilton HM KX, Bermuda
Fax: 441-296-8811
Email: claims@maxre.bm

(b)   All other Notices:

Underwriting Department
Max Re Ltd.
Max Re House
2 Front St.
P.O. Box HM 2565
Hamilton HM KX, Bermuda
Fax: 441-296-8811

**Item 9**    Application Date:  October 1, 2005



# TABLE OF CONTENTS

**NOTICE:** **THIS TABLE OF CONTENTS IS FOR REFERENCE PURPOSES ONLY. IT IS NOT PART OF THE TERMS, CONDITIONS OR EXCLUSIONS OF THIS POLICY AND IS NOT INTENDED TO AFFECT THE MEANING OF SUCH TERMS, CONDITIONS OR EXCLUSIONS.**

**Page**

I.      COVERAGE...........................................................................................................1

II.     LIMITS OF LIABILITY ........................................................................................1

III.    DEFINITIONS........................................................................................................4
        A.    "Advertising Liability" .................................................................................4
        B.    "Aircraft" ......................................................................................................4
        C.    "Annual Period"............................................................................................4
        D.    "Automobile".................................................................................................4
        E.    "Bodily Injury"..............................................................................................5
        F.    "Claim" ..........................................................................................................5
        G.    "Damages"......................................................................................................5
        H.    "Defense Costs".............................................................................................5
        I.    "Discharge".....................................................................................................5
        J.    "Discovery Period".........................................................................................5
        K.    "Executive Officer" .......................................................................................5
        L.    (1) Nature of Expectation or Intent...............................................................6
              (2)    Timing of Determination.....................................................................6
              (3)    Commercial Risk..................................................................................7
        M.    "Inception Date".............................................................................................7
        N.    "Incidental Watercraft Use"..........................................................................7
        O.    "Industrial Aid Aircraft Use" .......................................................................7
        P.    "Insured".........................................................................................................8
        Q.    "Insured's Products" .....................................................................................10
        R.    "Integrated Occurrence" ...............................................................................10
        S.    "Joint Venture" .............................................................................................11
        T.    "Named Insured" ..........................................................................................11
        U.    "Notice of Integrated Occurrence" ..............................................................11
        V.    "Occurrence"..................................................................................................11
        W.    "Personal Injury" ..........................................................................................12
        X.    "Policy Period" ..............................................................................................12
        Y.    "Pollutant".....................................................................................................12
        Z.    "Product Pollution Liability" ........................................................................12
        AA.   "Property Damage".........................................................................................12
        BB.   "Retroactive Coverage Date".........................................................................13

**Page**

CC.  "Termination" or "Termination Date" ..............................................13
DD.  "Ultimate Net Loss" ..............................................................13
EE.  "Waste" .........................................................................13
FF.  "Watercraft" ....................................................................13

IV.  EXCLUSIONS ..........................................................................14
  A.  PRIOR TO INCEPTION OR RETROACTIVE COVERAGE DATE ...............14
  B.  WORKERS' COMPENSATION, ETC. .................................................14
  C.  PROFESSIONAL SERVICES ........................................................14
  D.  OWNED PROPERTY; CARE, CUSTODY OR CONTROL, ETC. .............14
  E.  EFFICACY, LOSS OF USE, ETC. ..................................................15
  F.  ADVERTISING ......................................................................15
  G.  WAR 16
  H.  TOXIC SUBSTANCES ...............................................................16
  I.  AIRCRAFT ..........................................................................17
  J.  WATERCRAFT .......................................................................18
  K.  POLLUTION .........................................................................19
  L.  NUCLEAR ...........................................................................20
  M.  RADIOACTIVE CONTAMINATION (OUTSIDE U.S.) ..........................22
  N.  ERISA ..............................................................................22
  O.  REPETITIVE STRESS ...............................................................23
  P.  SECURITIES, ANTITRUST, ETC. ...................................................23

V.  NOTICE OF OCCURRENCE ..............................................................24
  A.  NOTICE AS SOON AS PRACTICABLE .............................................24
  B.  PERMISSIVE NOTICE .............................................................24
  C.  PERMISSIVE NOTICE OF INTEGRATED OCCURRENCE ....................24
  D.  MANNER OF NOTICE ..............................................................25

VI.  CONDITIONS .........................................................................25
  A.  PREMIUM ...........................................................................25
  B.  INSPECTION .......................................................................25
  C.  CROSS LIABILITY ..................................................................25
  D.  ASSISTANCE AND COOPERATION ................................................26
  E.  APPEALS ...........................................................................26
  F.  LOSS PAYABLE .....................................................................26
  G.  REPRESENTATION ..................................................................27
  H.  OTHER INSURANCE ...............................................................27
  I.  SUBROGATION ......................................................................28
  J.  CHANGES ...........................................................................28
  K.  ASSIGNMENT .......................................................................28
  L.  CANCELLATION ....................................................................28
  M.  CURRENCY .........................................................................29

| | | Page |
|---|---|---|
| N. | ARBITRATION | 29 |
| O. | LAW OF CONSTRUCTION AND INTERPRETATION | 31 |
| P. | LIABILITY OF THE COMPANY | 32 |
| Q. | POLICY EXTENSION | 32 |
| R. | REINSTATEMENT | 32 |
| S. | DISCOVERY PERIOD | 34 |
| T. | FORMER SUBSIDIARIES, AFFILIATES AND ASSOCIATED COMPANIES | 34 |
| U. | NOTICE | 35 |
| V. | HEADINGS | 35 |

| Schedule A | Additional Insureds |
| Schedule B | Underlying Insurance |
| Schedule C | Watercraft |
| Schedule D | Coverage B Annual Premium Charge |

## NOTICE

THIS IS A STAND-ALONE INDEMNITY POLICY WHICH IS NOT SUBJECT TO THE TERMS AND CONDITIONS OF ANY OTHER INSURANCE AND CONTAINS PROVISIONS WHICH MAY BE DIFFERENT FROM THOSE OF ANY OTHER INSURANCE. IT SHOULD BE READ CAREFULLY BY THE INSURED.

COVERAGE APPLIES, SUBJECT TO THE TERMS, CONDITIONS AND EXCLUSIONS OF THE POLICY, ONLY IF NOTICE OF OCCURRENCE IS FIRST GIVEN TO THE COMPANY DURING THE POLICY PERIOD OR, IF PURCHASED, THE DISCOVERY PERIOD. THE DATE SUCH NOTICE IS FIRST GIVEN IS THE DATE FOR DETERMINATION OF THE APPLICABLE LIMITS, RETENTIONS, TERMS, CONDITIONS AND EXCLUSIONS OF THE POLICY.

THE COMPANY DOES NOT HAVE ANY DUTY TO DEFEND. DEFENSE COSTS COVERED BY THIS POLICY ARE INCLUDED WITHIN AND ARE NOT IN ADDITION TO THE LIMITS OF LIABILITY OF THIS POLICY.

THIS POLICY (INCLUDING ANY ENDORSEMENTS) IS ISSUED IN CONSIDERATION OF THE PAYMENT OF THE PREMIUM SET FORTH IN ITEM 7 OF THE DECLARATIONS AND IN RELIANCE UPON THE STATEMENTS IN THE APPLICATION AND SCHEDULES ATTACHED THERETO AND INCORPORATED THEREIN AND REFERRED TO IN ITEM 9 OF THE DECLARATIONS AND ANY RENEWAL APPLICATION(S) AND ANY SUPPLEMENTARY INFORMATION PERTAINING TO ANY SUCH APPLICATION, WHICH SHALL BE DEEMED INCORPORATED HEREIN.

## INSURING AGREEMENTS

### I.  COVERAGE

Max Re Ltd. (the "**Company**") shall, subject to the limitations, terms, conditions and exclusions below, indemnify the **Insured** for **Ultimate Net Loss** the **Insured** pays by reason of liability:

    (a)    imposed by law, or

    (b)    of a person or party who is not an **Insured** assumed by the **Insured** under contract or agreement,

for **Damages** on account of:

    (i)      **Personal Injury**
    (ii)     **Property Damage**
    (iii)    **Advertising Liability**

encompassed by an **Occurrence**, provided:

    **COVERAGE A**:  notice of the **Occurrence** shall have been first given by the **Insured** in an **Annual Period** during the **Policy Period** in accordance with Article V of this Policy, or

    **COVERAGE B**:  notice of the **Occurrence** shall have been first given during the **Discovery Period** in accordance with Article V of this Policy, but only if the **Discovery Period** option has been elected in accordance with the provisions of this Policy.

### II.  LIMITS OF LIABILITY

A.    Regardless of the number of **Insureds** under this Policy, for each layer of coverage set forth in Item 2(a) of the Declarations the **Company** shall be liable only for that amount of **Ultimate Net Loss** for each **Occurrence** covered under this Policy which is in excess of the greater of:

    (1)    the amounts indicated as the limits (including, without limitation, any reinstatements thereof, where applicable) of the underlying insurances and any self-insured retentions listed, or which should have been listed, on the present or any prior Schedule B annexed to this Policy and any other underlying insurance, as to which the **Company** and the **Named Insured** expressly agree that the insurance provided by this Policy shall:

        (a)    be in excess in respect of such **Occurrences** or **Claims** and **Ultimate Net Loss** as are covered by said underlying insurances (it being understood

that this Policy shall in no way be subject to, or affected by, the terms, conditions or exclusions of said underlying insurances), and

(b) apply only as if such underlying insurances were fully available and collectable (except to the extent that any aggregate limits thereof are reduced or exhausted by actual payment of claims) for all occurrences or claims covered thereunder,

or

(2) the per Occurrence retention amount listed in Item 2 of the Declarations (which may be satisfied only by Ultimate Net Loss as defined herein),

and then only up to the per Occurrence limit of liability stated in Item 2(a) of the Declarations in respect of such layer for each Occurrence covered hereunder, and further subject to the aggregate limit of liability stated in Item 2(b) of the Declarations for all layers for all Occurrences covered hereunder of which notice is first given during each Annual Period (or during the Discovery Period with respect to the immediately preceding Annual Period or portion thereof); provided, however, that for all Insureds the applicable aggregate limit of liability, per Occurrence limit of liability, per Occurrence retention, and the terms, conditions and exclusions of coverage shall be determined under the Policy as in effect at the time notice of the Occurrence or Notice of Integrated Occurrence for which coverage is asserted is first given pursuant to Article V of this Policy by any Insured. This Policy shall not be subject to or follow the form of any underlying insurances but shall apply in accordance with its own terms, conditions and exclusions.

B. All Personal Injury or Property Damage covered hereunder encompassed by an Integrated Occurrence shall be added together and treated as included within one Occurrence. If notice of an Occurrence (which was not a Notice of Integrated Occurrence) was given during a prior Annual Period, and if Personal Injury or Property Damage which is included in such Occurrence is included in an Integrated Occurrence of which Notice of Integrated Occurrence is first given during a subsequent Annual Period, all Ultimate Net Loss arising from such earlier notified Occurrence shall be included in the Ultimate Net Loss arising from such Integrated Occurrence. Any payments of Ultimate Net Loss on account of such earlier notified Occurrence shall be deemed to have been made under the Annual Period in which the Company received such Notice of Integrated Occurrence. The erosion of the applicable limits of liability in the respective Annual Periods of this Policy shall be adjusted to reflect such transfer of Ultimate Net Loss payments from the prior Annual Period to the Annual Period in which Notice of Integrated Occurrence was first given.

C. (1) Notwithstanding Section II.B of the Policy, in any instance in which first notice of an Occurrence (which is not a Notice of Integrated Occurrence) ("Original Occurrence") is given where Personal Injury and/or Property Damage included

-2-

in such Original Occurrence is included in an **Integrated Occurrence** of which **Notice of Integrated Occurrence** is first given at a later time, if the **Ultimate Net Loss** attributable to the Original Occurrence (as finally determined) exceeds the per **Occurrence** retention for the **Annual Period** in which notice of the Original Occurrence was first given, then Ultimate Net Loss arising from such Original Occurrence shall not be transferred to the later **Annual Period** in which the **Company** received first notice of the Integrated Occurrence; the **Company** shall pay such Ultimate Net Loss in excess of per **Occurrence** retention amount, which shall be subject to and erode the aggregate limit of liability (Item 2(b) of the Declarations) for the **Annual Period** in which notice of the Original Occurrence was first given. Nonetheless, the **Ultimate Net Loss** arising from the Original Occurrence shall apply as respects erosion of the per **Occurrence** retention (Item 2(a) of the Declarations) and, when paid by the **Company**, the per **Occurrence** limit of liability (Item 2(a) of the Declarations) in the **Annual Period** in which Notice of Integrated Occurrence in respect thereof was first given; provided, however, that any Ultimate Net Loss indemnified by the **Company** in respect of the Original Occurrence shall not erode the annual aggregate limit of liability (Item 2 (b) of the Declarations) in the **Annual Period** in which Notice of Integrated Occurrence is first given.

(2)    Notwithstanding paragraph (3) of Definition III.V of the Policy, where separate **Occurrences** pursuant to such paragraph (3), except for the thirty (30) day limitation, would otherwise be a single **Occurrence** under paragraph (2) of Definition III.V, then all such separate **Occurrences**, combined, shall be subject to a limit of liability equal to the largest aggregate limit of liability stated in Item 2(b) of the Declarations in effect at the time of first notice of any such separate **Occurrence** pursuant to Article V of this Policy by any **Insured**.

D.    (1)    As regards any liability of an **Insured** which arises in any manner whatsoever out of operations or the existence of any **Joint Venture** in which such **Insured** has an interest, the liability of the **Company** under this Policy in each layer shall be limited to the product of (i) the percentage interest of the **Insured** in such liability of such **Joint Venture** (whether direct or by virtue of the insolvency of others interested in such **Joint Venture**) and (ii) the total limit of liability insurance afforded such **Insured** for such layer by this Policy.

(2)    It is further understood and agreed that in circumstances where paragraph (1) applies to limit the liability of the **Company** under this Policy, the **Company** shall be liable for each layer in respect of the liability of the **Insured** in excess of the greater of:

(a)    the product of the per **Occurrence** retention amount specified in Item 2 of the Declarations for such layer and the percentage interest of the **Insured**

-3-

in such liability of such **Joint Venture** as determined pursuant to paragraph (1), or

(b)    the limits of the underlying insurance(s) (as reduced by general provisions relating to **Joint Ventures**, if applicable).

(3)    It is further understood and agreed that paragraphs (1) and (2) of this Section D shall not apply if:

(i)    the **Insured** has sole responsibility for the **Joint Venture**, or

(ii)    the **Insured** is obligated to provide insurance for the **Joint Venture** in its entirety such as is afforded by this Policy.

E.    The inclusion or addition hereunder of more than one **Insured** shall not operate to increase the **Company's** limits of liability beyond those set forth herein.

### III.  DEFINITIONS

A.    "**Advertising Liability**" means liability for **Damages** on account of:

(1)    libel, slander or defamation,

(2)    any infringement of copyright or of title or of slogan,

(3)    piracy or misappropriation of ideas under an implied contract, or

(4)    any invasion of right of privacy,

committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the **Insured's** advertising activities.

B.    "**Aircraft**" means any aircraft, missile or spacecraft.

C.    "**Annual Period**" means:

(1)    with respect to the first **Annual Period**, the period commencing at the **Inception Date** and expiring on the First **Annual Period** Expiration Date set forth in Item 3 of the Declarations;

(2)    with respect to any subsequent **Annual Period** in Coverage A, the one (1) year period commencing at the First **Annual Period** Expiration Date or each anniversary thereof; or

(3)    with respect to Coverage B, the one (1) year period commencing at the expiration of Coverage A or each anniversary date and time of such expiration.

D.      **"Automobile"** means a land motor vehicle, trailer or semi-trailer.

E.      **"Bodily Injury"** means physical injury to the body of a person including death at any time resulting therefrom.

F.      **"Claim"** means an oral or written demand against an **Insured** for **Damages** and includes the threat or initiation of any suit or arbitration proceeding or a request for a tolling agreement.

G.      **"Damages"** means all forms of compensatory damages, monetary damages and statutory damages, punitive or exemplary damages and costs of compliance with equitable relief, other than governmental (civil or criminal) fines or penalties, which the Insured shall be obligated to pay by reason of judgment or settlement for liability on account of **Personal Injury, Property Damage** and/or **Advertising Liability** covered by this Policy, and shall include **Defense Costs**.

H.      **"Defense Costs"** means reasonable legal costs and other expenses incurred by or on behalf of the **Insured** in connection with the defense of any actual or anticipated **Claim**, including attorneys' fees and disbursements, law costs, premiums on attachment or appeal bonds, pre-judgment and post-judgment interest, expenses for experts and for investigation, adjustment, appraisal and settlement, excluding the salaries, wages and benefits of the **Insured's** employees and the **Insured's** administrative expenses.

I.      **"Discharge"** means discharge, emission, dispersal, migration, release or escape (or any series of such of a similar nature at the same site) but does not include any discharge, emission, dispersal, migration, release or escape to the extent that the **Pollutants** involved remain confined within the building or other man-made structure in which they initially were located.

J.      **"Discovery Period"** means the period, if applicable, commencing upon the **Termination Date** of Coverage A of this Policy and ending on the earlier of expiration of the last **Annual Period** for which Coverage B is elected as provided in Condition S hereof or the effectiveness of cancellation pursuant to Condition L hereof.

K.      **"Executive Officer"** means the Chairman of the Board, Chief Executive, Operating, Financial and Administrative Officers, Managing Director, and any Vice President (including, without limitation, Executive and Senior levels) and any manager in the Risk Management or Law Department of the Named Insured or, if the Named Insured is not the principal operating company insured hereunder, of the **Insured** which is the principal operating company; if any of such designations are not applicable, the equivalent level personnel shall be substituted.

-5-

L.   (1)   **Nature of Expectation or Intent**

Personal Injury, Property Damage or Advertising Liability shall be "Expected or Intended" where:

(a)   actual or alleged Personal Injury, Property Damage or Advertising Liability is expected or intended by an Insured;

(b)   as respects an **Integrated Occurrence**, an Insured has historically experienced a level or rate of actual or alleged Personal Injury or Property Damage; or

(c)   as respects an **Integrated Occurrence**, an Insured expects or intends a level or rate of actual or alleged Personal Injury or Property Damage (irrespective of whether or not the Insured expects or intends Personal Injury to any specific individual or Property Damage to any specific property);

provided, however, that in the case of subparagraph (b) and/or (c) above, if actual or alleged Personal Injury or Property Damage fundamentally different in nature or at a level or rate vastly greater in order of magnitude occurs, all such actual or alleged fundamentally different or vastly greater Personal Injury or Property Damage shall not be deemed "Expected or Intended" (subject to paragraph 3 below).

(2)   **Timing of Determination**

"Expected or Intended" is determined with reference to what is Expected or Intended (as set forth in paragraph 1 above):

(a)   at the time of any action (or inaction) by any person so acting (or failing to act) on behalf of an Insured (including, without limitation, the sale by an Insured of any Insured's Products) concerning the consequences thereof; the expectation or intent of any individual person shall be attributed to an entity Insured only if and to the extent that such person is acting (or failing to act) within the scope of their duties on behalf of such entity,

(b)   at the Inception Date by any Executive Officer, and/or

(c)   as respects any liability of a person or party who is not an Insured assumed by an Insured under a contract or agreement, by an Insured at the time of such assumption.

(3)    **Commercial Risk**

As respects any **Integrated Occurrence** arising out of the **Insured's Products**, actual or alleged **Personal Injury** or **Property Damage** similar to, and not vastly greater in order of magnitude than, that included in such **Integrated Occurrence** arising out of sales, if any, of such products by the **Insured** after the date of the **Notice of Integrated Occurrence** shall be deemed **Expected or Intended**. No inference shall be drawn from the giving of a **Notice of Integrated Occurrence** or from this paragraph (3) that actual or alleged **Personal Injury** or **Property Damage** arising out of sales of such products by the **Insured** prior to the date of such **Notice of Integrated Occurrence** either was or was not **Expected or Intended**.

M.    **"Inception Date"** means the date set forth in Item 3 of the Declarations; provided, however, that with respect to any **Insured** which becomes an **Insured** subsequent to the **Inception Date**, the **Inception Date** for that **Insured** shall be the date such person or entity became an **Insured** under this Policy or such other date as may be agreed in writing between the Named Insured and the Company; provided further that as respects any layer of coverage not set forth in Item 2(a) of the original Declarations which is added by Endorsement, the **Inception Date** shall be the effective date of such Endorsement unless otherwise agreed in writing between the Named Insured and the Company.

N.    **"Incidental Watercraft Use"** means use by the **Insured** of any owned, leased or chartered **Watercraft** less than 75 feet in length but shall not include:

(1)    use of **Watercraft** for the commercial carriage for a fee of passengers or cargo for parties other than the **Insured** in exchange for a fee;

(2)    use of **Watercraft** in connection with the commercial provision of marine services to others for a fee;

(3)    use of any **Watercraft** held in inventory or otherwise for lease or charter to another person by an **Insured** in the business of lease or charter of **Watercraft**; or

(4)    use of **Watercraft** owned by a party other than the **Insured** which is being serviced, maintained, fueled, or tested or otherwise is in the temporary care, custody or control of the **Insured** in connection with any business operations of the **Insured** relating to **Watercraft** servicing, maintenance, fueling, testing, storage or associated or similar matters.

O.    **"Industrial Aid Aircraft Use"** means use by the **Insured** of any owned, non-owned, leased or chartered **Aircraft** principally for the transportation of officers and employees of the **Insured** and invited guests having a seating capacity (exclusive of cockpit crew

-7-

but inclusive of cabin crew) of no more than 20 persons (whether or not all such seats are occupied) but shall not include:

(1)     use of any Aircraft for any commercial or charter passenger and/or cargo airline, any other Aircraft charter operation, any flight school or aviation training business or any other operations by which the Insured for compensation (other than cost reimbursement) makes available Aircraft owned, operated or used by it or aviation transportation services to others;

(2)     use of any Aircraft held in inventory or otherwise for sale, lease, charter or delivery to another person by an Insured in the business of manufacture, sale, lease or charter of Aircraft;

(3)     use of Aircraft for product testing or demonstration purposes;

(4)     use of Aircraft owned by a party other than the Insured which is being serviced, maintained, fueled or tested or otherwise is in the temporary care, custody or control of the Insured in connection with any business operations of the Insured relating to Aircraft servicing, maintenance, fueling, testing, storage or associated or similar matters; or

(5)     use of any Aircraft giving rise to liability of the Insured arising out of the Insured's Products.

P.     "Insured" means, except as specifically stated otherwise in this Policy, all Insureds as defined below:

(1)     the Named Insured and, if the Named Insured is designated in Item 1(a) of the Declarations as a partnership or Joint Venture, the partnership or Joint Venture so designated and each partner or member thereof but only with respect to his or its liability as such;

(2)     (a)     any subsidiary or affiliate of the Named Insured for any Annual Period whose accounts as of the date of the financial statements of the Named Insured submitted to the Company most recently prior to the rating of the premium for such Annual Period (i) are consolidated in the financial statements of the Named Insured in accordance with generally accepted accounting principles in the United States of America, or (ii) were eligible for such consolidation (or in the case of a non-United States Named Insured would have been consolidated or eligible for consolidation if United States generally accepted accounting principles applied) and whose financial statements were submitted to the Company with such financial statements of the Named Insured as of such date;

-8-

(b)     any subsidiary, affiliate or associated company of the **Named Insured** listed on Schedule A hereto;

(3)     any present or former officer, director, stockholder or employee of any person or entity named in paragraph (1) or (2) above or (6) below, but only while acting within the scope of his or her duties as such, and any person or organization with respect to liability for providing real estate management for any such person or entity named in paragraph (1) or (2) above or (6) below;

(4)     any person, organization, trustee or estate to whom any person or entity named in paragraph (1) or (2) above or (6) below is obligated by virtue of a written contract or agreement to provide insurance such as is afforded by this Policy, but only to the extent of such obligation and only in respect of operations (other than commercial insurance operations) by or on behalf of such person or entity named in paragraph (1) or (2) above or (6) below or of facilities owned or used by such person or entity named in paragraph (1) or (2) above or (6) below;

(5)     with respect to any **Automobile** owned by any person or entity named in paragraph (1), (2) or (3) above or (6) below or hired for use on behalf of any such person or entity, any person or organization legally responsible for the use thereof, provided the actual use of the **Automobile** is with the permission of such person or entity;

(6)     any **Joint Venture** in which any entity listed in paragraph (1) or (2) above has an interest, but only if:

(a)     the Insured has sole responsibility for the **Joint Venture**, or

(b)     the Insured is obligated to provide insurance for the **Joint Venture** in its entirety such as is afforded by this Policy.

(7)     It is agreed automatically to include as an **Insured** without listing on Schedule A hereto or adjustment of premium under this Policy for any **Annual Period** any entity acquired or formed by or merged with an **Insured** (a "**Potential Additional Insured**") during such **Annual Period** provided that:

(a)     the fair value of the sum of all cash, securities, assumed indebtedness and other consideration expended by all **Insureds** for any such acquisition, formation or merger or any series of interrelated acquisitions, formations or mergers does not exceed 5% of the total assets of the **Named Insured** and its consolidated subsidiaries and affiliates as most recently reported to the **Company** for rating purposes prior to such **Annual Period**;

(b)     the incremental annual gross revenues attributable to such acquisition, formation or merger or series of interrelated acquisitions, formations or

-9-

mergers do not exceed 5% of the total annual gross revenues of the **Named Insured** and its consolidated subsidiaries and affiliates as most recently reported to the **Company** for rating purposes prior to such **Annual Period**; and

(c)    neither the operations of the Potential Additional Insured prior to such acquisition, formation or merger or any series of interrelated acquisitions, formations or mergers nor the resultant combined or consolidated operations of the **Insured** and the Potential Additional Insured subsequent to such acquisition, formation or merger or any series of interrelated acquisitions, formations or mergers are materially different from those of such **Insured** prior to such acquisition, formation or merger or series of interrelated acquisitions, formations or mergers.

Unless notice to the **Company** shall have been given and additional premium, if any, shall have been paid in respect of any acquisition, formation or merger (or series thereof) not meeting the criteria set forth herein, such **Potential Additional Insured** shall not be an **Insured** hereunder, and liability assumed by an **Insured** in connection with such acquisition, formation or merger (or series thereof) shall not be indemnified hereunder.

With respect to any **Occurrence** giving rise to liability of any Potential Additional Insured that qualifies as an **Insured** hereunder, the **Inception Date** shall be the date of merger with or acquisition or formation of the Potential Additional Insured by an **Insured** or such other date as may be agreed in writing between the **Named Insured** and the **Company**.  If during any **Annual Period** an **Insured** acquires a business, division or other operations by asset acquisition, such asset acquisition shall be considered an acquisition of an entity for purposes of this paragraph (7).

Q.    "**Insured's Products**" means goods or products manufactured, sold, tested, handled or distributed by the **Insured** or others trading under its name, or tools, uninstalled equipment or abandoned or unused materials that were the subject of completed operations performed for others by the **Insured**.

R.    "**Integrated Occurrence**" means an **Occurrence** encompassing actual or alleged **Personal Injury, Property Damage** and/or **Advertising Liability** to two or more persons or properties which commences over a period longer than thirty (30) consecutive days which is attributable directly, indirectly or allegedly to the same actual or alleged event, condition, cause, defect, hazard and/or failure to warn of such; provided, however, that such **Occurrence** must be identified in a notice pursuant to Section C of Article V as an "**Integrated Occurrence**" and is subject to all provisions of paragraphs (1) and (2) of **Definition V.**

-10-

S.   "**Joint Venture**" means any joint venture, co-venture, joint lease, joint operating agreement or partnership, which in each case is neither incorporated nor otherwise affords limited liability to an **Insured** having an interest therein.

T.   "**Named Insured**" means the entity first named in Item 1(a) of the Declarations.

U.   "**Notice of Integrated Occurrence**" means a notice pursuant to Definition R, given in accordance with the provisions of Article V, Sections C and D.

V.   "**Occurrence**" (1) exists if, and only if:

     (a)    except with respect to actual or alleged **Personal Injury** or **Property Damage** arising from the **Insured's Products**, there is an event or continuous, intermittent or repeated exposure to conditions which event or conditions commence on or subsequent to the **Inception Date**, or the **Retroactive Coverage Date**, if applicable, and before the **Termination Date of Coverage A**, and which cause actual or alleged **Personal Injury, Property Damage** or **Advertising Liability**;

     (b)    actual or alleged **Personal Injury** to any individual person, or actual or alleged **Property Damage** to any specific property, arising from the **Insured's Products** takes place on or subsequent to the **Inception Date**, or the **Retroactive Coverage Date**, if applicable, and before the **Termination Date of Coverage A**.

  (2)    Except as provided in paragraph (3) below, where an **Occurrence** exists and a series of and/or several actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities** occur which are attributable directly, indirectly or allegedly to the same actual or alleged event, condition, cause, defect, hazard and/or failure to warn of such, all such actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities** shall be added together and treated as encompassed by one **Occurrence** irrespective of the period (but without limiting the effect of Exclusion IV.A) or area over which the actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities** occur or the number of such actual or alleged **Personal Injuries, Property Damages** and/or **Advertising Liabilities**; provided, however, that any actual or alleged **Personal Injury, Property Damage** or **Advertising Liability** which is **Expected or Intended** by any **Insured** shall not be included in any **Occurrence**. So far as **Personal Injuries, Property Damages** and/or **Advertising Liabilities** resulting or alleged to result from the design, formulation, manufacture, distribution, use, operation, maintenance and/or repair of an **Insured's Product**, and/or the failure to warn as to the use, operation, maintenance and/or repair of an **Insured's Product**, the term "the same actual or alleged event, condition, cause, defect, hazard and/or failure to warn of such" means any such design, formulation, manufacture, distribution, use, operation, maintenance, repair and/or

-11-

failure to warn, as the case may be, as to which such losses, injuries or damages are directly, indirectly or allegedly attributable. As respects **Advertising Liability**, multiple or repeated broadcasts or publications of the same or similar materials shall constitute "the same actual or alleged event, condition, cause or defect."

(3)   Notwithstanding paragraphs (1) and (2) above, if an **Occurrence** is not identified in the notice thereof as an "**Integrated Occurrence**," then actual or alleged **Personal Injury** to each person, **Property Damage** to each piece of property and/or **Advertising Liability** which commences at any time shall be deemed to be encompassed within a separate **Occurrence** from which **Personal Injury** to any other person, **Property Damage** to any other piece of property and/or **Advertising Liability** which commences more than thirty (30) days prior or later thereto is encompassed.

W.   "**Personal Injury**" means **Bodily Injury**, mental injury, mental anguish, shock, sickness, disease, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, discrimination, humiliation, and libel, slander or defamation of character or invasion of rights of privacy.

X.   "**Policy Period**" means the period commencing with the **Inception Date** and ending with the **Termination Date** of Coverage A.

Y.   "**Pollutant**" means any solid, liquid, gaseous or thermal irritant, contaminant or toxic or hazardous substance or any substance which may, does, or is alleged to affect adversely the environment, property, persons or animals, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and **Waste**.

Z.   "**Product Pollution Liability**" means liability or alleged liability for **Personal Injury** or **Property Damage** arising out of the end-use of the **Insured's Products**, if such use occurs after possession of such goods or products has been relinquished to others by the **Insured** or by others trading under its name and if such use occurs away from premises owned, rented or controlled by the **Insured**; such goods or products shall be deemed to include any container thereof other than an **Automobile**, **Watercraft** or **Aircraft**.

AA.   "**Property Damage**" means:

(1)   physical damage to or destruction of tangible property, including the loss of use thereof at any time resulting therefrom;

(2)   loss of use of tangible property which has not been physically damaged or destroyed arising from physical damage to or destruction of other tangible property; or   ...

-12-

(3)     losses consequent upon evacuation arising from actual or threatened **Bodily Injury** or destruction of tangible property.

BB.   **"Retroactive Coverage Date"** means the date, if any, set forth in Item 4 of the Declarations; provided, however, that with respect to coverage for any **Insured** which becomes an **Insured** subsequent to the **Inception Date**, the **Retroactive Coverage Date** shall be the date such person or entity became an **Insured** under this Policy or such other date as may be endorsed on to this Policy in writing; provided further that as respects any layer of coverage not set forth in Item 2(a) of the original Declarations which is added by Endorsement, the **Retroactive Coverage Date** shall be the effective date of such Endorsement unless otherwise agreed in writing between the **Named Insured** and the **Company.**

CC.   **"Termination"** or **"Termination Date"** means:

(1)     for Coverage A, the earlier of the effective cancellation date of this Policy pursuant to Condition L or the end of an **Annual Period** if Coverage A is not extended pursuant to Condition Q;

(2)     for Coverage B, the end of the **Discovery Period.**

DD.   **"Ultimate Net Loss"** means the total sum which the **Insured** shall become obligated to pay for **Damages** on account of **Personal Injury, Property Damage** and/or **Advertising Liability** which is, and/or but for the amount thereof would be, covered under this Policy less any salvages or recoveries.

EE.   **"Waste"** means all waste and includes, without limitation, materials to be discarded, stored pending final disposal, recycled, reconditioned or reclaimed.

FF.   **"Watercraft"** means any ship or vessel of whatever type, including, but not limited to, cargo vessels, passenger vessels, other vessels used for transport, towboats and barges, vessels used in the construction of pipelines, platforms or other facilities, storage vessels, tanker vessels, drill ships, drilling rigs and barges (including, without limitation, submersible drill rigs and barges, semi-submersible drill rigs and barges and self-elevating drill rigs and barges) and all other vessels of whatever nature and description, all whether or not self-propelled.  Watercraft shall not include an offshore oil or gas platform secured in place for drilling or producing operations.

## IV.    EXCLUSIONS

This Policy does not apply to actual or alleged:

### A.    PRIOR TO INCEPTION OR RETROACTIVE COVERAGE DATE

**Personal Injury** to any individual person, **Property Damage** to any specific property or **Advertising Liability** which takes place prior to the **Inception Date** or, if applicable, the **Retroactive Coverage Date.**

### B.    WORKERS' COMPENSATION, ETC.

Liability in respect of any obligation for which the **Insured** or any company as its insurer may be liable under any workers' compensation, unemployment compensation or disability benefits law; provided, however, that this Exclusion B does not apply to liability of others assumed by the **Insured** under contract or agreement or to liability arising under the Federal Employers Liability Act, the Jones Act or, in the case of any **Insured** which is an authorized self-insured, the Longshoremen's and Harbor Workers' Compensation Act.

### C.    PROFESSIONAL SERVICES

Liability for **Property Damage** arising out of any act, error or omission in the rendering of professional services, other than architectural and engineering services (which are nonetheless subject to the other exclusions herein, including, without limitation, Exclusion E below), including, but not limited to, the rendering of legal, accounting, data processing, consulting, or investment advisory services.

### D.    OWNED PROPERTY; CARE, CUSTODY OR CONTROL, ETC.

**Property Damage** to:

(1)    property owned or occupied by or rented to any **Insured**;

(2)    property loaned to any **Insured**;

(3)    property in the care, custody or control of any **Insured**; or

(4)    that particular part of real property or fixtures on which any **Insured** or any contractors or sub-contractors working directly or indirectly on behalf of any **Insured** are performing operations, if such **Property Damage** arises out of such operations;

provided, however, that paragraphs (2), (3) and (4) of this Exclusion D do not apply to liability assumed under a railway sidetrack agreement; provided further that paragraphs (1) and (3) of this Exclusion D do not apply as respects damage to property of

-14-

any Insured which is an Insured solely by virtue of paragraph (4) of Definition P where such property is not owned or occupied by, rented to, or in the care, custody or control of any Insured which is an Insured other than by virtue of paragraph (4) of Definition P.

**E.     EFFICACY, LOSS OF USE, ETC.**

Liability of the Insured:

(1)     arising out of the failure of any **Insured's Products** or of work, including architectural or engineering services, by or on behalf of any **Insured** to meet any warranty or representation by any **Insured** as to the level of performance, quality, fitness or durability or to perform their function or serve their purpose, to the extent that such liability is for the diminished value or utility of any **Insured's Products** or work by or on behalf of any **Insured**;

(2)     without limiting paragraph (1) of this Exclusion E, in respect of **Property Damage** to any **Insured's Products** or of work, including, without limitation, architectural or engineering services, performed by or on behalf of any **Insured**, if such **Property Damage** arises out of any portion of such products or work, or out of materials, parts or equipment furnished in connection therewith;

(3)     for the costs incurred for the withdrawal, inspection, repair, recall, return, replacement or disposal of any **Insured's Products** or work, including, without limitation, architectural or engineering services, or, in connection with any of the foregoing, loss of use thereof; provided, however, that this paragraph (3) shall not apply in respect of costs incurred for the withdrawal, inspection, repair, recall, return, replacement or disposal of products or work of a party other than an **Insured** of which the **Insured's Products** or work forms a part; or

(4)     in respect of decline of value of real or personal property to the extent such decline in value is attributable not to physical damage or destruction thereof but to proximity to continuing operations, activities or equipment which limit the usage of such property or make occupation of such property by people less feasible or desirable.

**F.     ADVERTISING**

**Advertising Liability** arising out of:

(1)     breach of contract, but this paragraph (1) shall not exclude liability for unauthorized misappropriation of advertising ideas based upon breach or alleged breach of an implied contract;

(2)     infringement of registered trademarks, service marks or trade name by use thereof, but this paragraph (2) shall not apply to titles or slogans;

-15-

(3)     the failure of goods, products or services to conform with advertised quality or performance;

(4)     the wrong description of the price of goods, products or services; or

(5)     advertising activities on behalf of a party other than an Insured by an Insured engaged in the business of advertising.

## G.     WAR

**Personal Injury, Property Damage or Advertising Liability** directly or indirectly occasioned by, happening through or in consequence of war, invasion, hostile action of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority; provided, however, that this Exclusion G shall not apply to **Personal Injury, Property Damage or Advertising Liability:**

(1)     taking place in and caused by the foregoing events in the land area of the United States of America, its territories or possessions, Puerto Rico or Canada; or

(2)     caused by any act or acts committed by one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes where (a) such person or persons are not acting on behalf of a government, governmental authority or other power (usurped or otherwise) which exercises de facto jurisdiction over part or all of the populated land area of the country in which the **Personal Injury** or **Property Damage** takes place; and (b) if such person or persons are acting as an agent or agents of any government recognized de jure by a majority of Belgium, Canada, France, Germany, Japan, the United Kingdom and the United States, such person or persons are acting secretly and not in connection with the operation of regular military or naval armed forces in the country where the **Personal Injury** or **Property Damage** takes place.

## H.     TOXIC SUBSTANCES

**Personal Injury, Property Damage or Advertising Liability** arising out of the manufacture, distribution, sale, installation, removal, utilization, ingestion or inhalation of, or exposure to or existence of, as the case may be:

(1)     asbestos or any asbestos-containing materials; provided, however, that this Exclusion H shall not apply to **Property Damage** arising out of asbestos not contained in the Insured's Products as a result of explosion, hostile fire or lightning;

-16-

(2)     tobacco or any tobacco products (or ingredients of, or used in the manufacture or production of, such products);

(3)     2,3,7,8-TCDD (2,3,7,8-tetrachlorodibenzo-p-dioxin);

(4)     asbestiform talc;

(5)     diethylstilbestrol ("DES");

(6)     any intra-uterine device ("IUD");

(7)     any product containing silicone which is in any form implanted or injected in the body;

provided, however, that this Exclusion H shall not apply to actual or alleged **Personal Injury** or **Property Damage** where such **Personal Injury** or **Property Damage** is not related to the asbestos, tobacco (or other consumed portion of a tobacco product), 2,3,7,8-TCDD, asbestiform talc, DES, IUD or silicone content of goods, materials or products or completed operations. The listing of materials herein shall not give rise to an inference that **Personal Injury, Property Damage** or **Advertising Liability** attributable to other materials was neither **Expected** nor **Intended** by the Insured.

**I.     AIRCRAFT**

Liability arising out of the design, manufacture, construction, maintenance, service, use or operation of any **Aircraft** or any component part or equipment thereof or any other **Aircraft** navigational or related equipment or service, including, without limitation, liability arising from a crash or hijacking; provided, however, that this Exclusion I shall not apply to any liability or alleged liability in respect of:

(1)     **Aircraft** fueling and related operations with respect to **Personal Injury** or **Property Damage** occurring at the time of such operations, i.e., while the **Aircraft** involved is on the ground and motionless;

(2)     liability in respect of any item of goods intended to be a component part of an **Aircraft** or **Aircraft** equipment where such part or equipment has not yet been incorporated into any **Aircraft** (other than an incomplete **Aircraft** which is in the process of initial manufacture at an indoor premises and which has never been used for self-propelled movement either on the ground or in the air) and such liability and the **Personal Injury, Property Damage** or **Advertising Liability** giving rise thereto do not arise directly or indirectly out of a crash, hijacking or other circumstance in connection with the operation of any **Aircraft**;

(3)     liability in connection with manufacturing and associated operations in respect of **Aircraft** or any component part thereof or any **Aircraft** equipment where all

-17-

**Personal Injury** and **Property Damage** giving rise to such liability take place at a manufacturing, storage or associated premises on the ground (or in connection with on the ground transportation by other than an **Aircraft**) and such liability and the **Personal Injury, Property Damage** or **Advertising Liability** giving rise thereto do not arise directly or indirectly out of a crash, hijacking or other circumstance in connection with the operation of any **Aircraft**;

(4)     the **Insured's Products** which consist of or are incorporated into cabin furnishings, food service equipment or other materials or equipment used in the interior of an **Aircraft** which are not necessary or integrally related to flight, take-off, landing or navigation of the **Aircraft**;

(5)     the **Insured's Products** which are of a type and grade sold principally for purposes other than use in **Aircraft** or aviation which are incorporated into **Aircraft** hulls or components or aviation related equipment (e.g., microchips used principally in personal computers which also are used in flight computers or a grade of aluminum ingot suitable for a broad range of commercial uses which is used in an **Aircraft** wing);

(6)     liability for physical **Property Damage** to third parties or **Personal Injury** arising out of or allegedly arising out of **Industrial Aid Aircraft Use**, but in respect of any **Occurrence** arising out of **Industrial Aid Aircraft Use** the per **Occurrence** retention amount shall be the greater of the amount set forth in Item 2(a) of the Declarations or US$100,000,000. "Physical **Property Damage** to third parties" shall include only physical damage to other **Aircraft** or to tangible property on the ground occurring upon the physical impact of the **Aircraft** owned, leased or chartered by the **Insured** or the debris thereof with such other **Aircraft** or property on the ground (as well as associated debris removal) and shall not include, without limitation, **Property Damage** to the hull or any other portion of the **Aircraft**, owned, used, leased or chartered by the **Insured** or to its cargo or other contents; or

(7)     liability of an **Insured** in its capacity as architect, engineer, construction contractor, owner, lessee, operator or occupant of, or party otherwise having responsibility for, any building or other ground-based fixed structure or **Watercraft** with which an **Aircraft** collides.

J.     **WATERCRAFT**

Liability arising out of the design, construction, maintenance, sale, manning, ownership or operation of any **Watercraft**, but this Exclusion J shall not apply to:

(1)     **Watercraft** or risks listed on Schedule C hereto and any additional **Watercraft** acquired in the ordinary course of business during the **Policy Period** which are of a similar type and use as the **Watercraft** listed on Schedule C; provided,

-18-

however, that the aggregate gross tonnage of all such additional **Watercraft** shall not exceed 20% of the gross tonnage of **Watercraft** listed on Schedule C;

(2)    loading or unloading of any **Watercraft** at premises owned, leased or controlled by the **Insured**;

(3)    liability for any **Personal Injury** or **Property Damage** to third parties arising out of or allegedly arising out of **Incidental Watercraft Use** (provided that damage to the hull or any portion, component or equipment of the **Watercraft** owned, leased or chartered by the **Insured** or to its cargo contents shall not constitute **Property Damage** to third parties);

(4)    liability for **Personal Injury**, **Property Damage** or **Advertising Liability** arising out of the design, construction, maintenance or sale by the **Insured** of any **Watercraft** less than 75 feet in length; or

(5)    **Personal Injury**, **Property Damage** or **Advertising Liability** arising out of or alleged to arise out of design, manufacture, maintenance or sale by the **Insured** of any component part or equipment of any **Watercraft**.

## K.   POLLUTION

(1)    (a)    liability for **Personal Injury**, **Property Damage** or **Advertising Liability** arising out of the **Discharge of Pollutants** into or upon land or real estate, the atmosphere, or any watercourse or body of water whether above or below ground or otherwise into the environment; or

    (b)    liability, loss, cost or expense of any **Insured** or others arising out of any direction or request, whether governmental or otherwise, that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

This Exclusion K applies whether or not such **Discharge** of such **Pollutants**:

    (i)    results from the **Insured's** activities or the activities of any other person or entity;

    (ii)    is sudden, gradual, accidental, unexpected or unintended; or

    (iii)    arises out of or relates to industrial operations or the **Waste** or by-products thereof.

(2)    Paragraph (I) of this Exclusion K does not apply to:

    (a)    Product Pollution Liability; or

-19-

(b)   (i)   liability of the **Insured** for **Personal Injury** or **Property Damage** caused by an intentional **Discharge of Pollutants** solely for the purpose of mitigating or avoiding **Personal Injury** or **Property Damage** which would be covered by this Policy; or

(ii)   liability of the **Insured** for **Personal Injury** or **Property Damage** caused by a **Discharge of Pollutants** which is not **Expected or Intended**, but only if the **Insured** becomes aware of the commencement of such **Discharge** within seven (7) days of such commencement;

provided that the **Insured** gives the **Company** written notice in accordance with Section D of Article V of this Policy of such commencement of the **Discharge** under subparagraphs (2)(b)(i) or (ii) of this Exclusion K within forty (40) days of such commencement.  Such notice must be provided irrespective of whether notice as soon as practicable otherwise would be required pursuant to Section A of Article V of this Policy.

## L.   NUCLEAR

Liability for:

(1)   **Personal Injury, Property Damage** or **Advertising Liability** in the United States, its territories or possessions, Puerto Rico or the Canal Zone (A) with respect to which an **Insured** under this Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability or (B) resulting from the hazardous properties of nuclear material and with respect to which (i) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (ii) the **Insured** is or, had this Policy not been issued, would be entitled to indemnity from the United States of America or any agency thereof under any agreement entered into by the United States of America or any agency thereof with any person or organization;

(2)   medical or surgical relief or expenses incurred with respect to **Bodily Injury**, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization in the United States, its territories or possessions, Puerto Rico or the Canal Zone;

(3)   injury, sickness, disease, death or destruction resulting from hazardous properties of nuclear material, if:

-20-

(a)    the nuclear material (i) is at any nuclear facility owned by or operated by or on behalf of an insured in the United States, its territories or possessions, Puerto Rico or the Canal Zone or (ii) has been discharged or dispersed therefrom;

(b)    such nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed by or on behalf of an Insured in the United States, its territories or possessions, Puerto Rico or the Canal Zone; or

(c)    the injury arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of a nuclear facility, but if such facility is located within the United States of America, its territories or possessions, Puerto Rico or the Canal Zone, this subparagraph (c) applies only to injury to or destruction of property at such nuclear facility.

(4)    As used in this Exclusion:

(a)    "hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material," "special nuclear material" and "by-product material" have the meanings given them by the Atomic Energy Act of 1954 or in law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material

    (i)    containing by-product materials; and

    (ii)    resulting from the operation by a person or organization of a nuclear facility included within the definition of nuclear facility under clauses (i) or (ii) of subparagraph (b) below;

(b)    "nuclear facility" means:

    (i)    any nuclear reactor;

    (ii)    any equipment or device designed or used for (x) separating the isotopes of uranium or plutonium, (y) processing or utilizing spent fuel, or (z) handling, processing or packaging waste;

    (iii)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the Insured at such premises

where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or combination thereof or more than 250 grams of uranium 235;

(iv)    any structure, basin, excavation, premises or place prepared for storage or disposal of waste;

(c)    "nuclear facility" includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

(d)    "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

(e)    with respect to injury or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property or loss of the use thereof.

## M.    RADIOACTIVE CONTAMINATION (OUTSIDE U.S.)

Liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionizing radiations or contamination by radioactivity outside the United States, its territories or possessions, Puerto Rico or the Canal Zone from any nuclear fuel or from any nuclear waste from the combustion, fission or fusion of nuclear fuel.

## N.    ERISA

Liability arising out of any negligent act, error or omission of any Insured, or any other person for whose acts any Insured is legally liable, in the administration of any Insured's Employee Benefits Programs, as defined below, including, without limitation, liability or alleged liability under the Employee Retirement Income Security Act of 1974, as amended, or any similar provisions of state statutory law or common law or any other law.

As used in this Exclusion N, the term "Employee Benefits Programs" means group life insurance, group accident or health insurance, profit sharing plans, pension plans, employee stock subscription plans, workers' compensation, unemployment insurance, social benefits, disability benefits, and any other similar employee benefits.

As used in this Exclusion N, the term "administration" means any of the following acts if such acts are authorized by the Insured:

(i)    giving counsel to employees with respect to the Employee Benefits Programs;

(2)    interpreting the Employee Benefits Programs;

(3)    handling of records in connection with the Employee Benefits Programs; or

(4)    enrolling, terminating or canceling employees under the Employee Benefits Programs.

## O.    REPETITIVE STRESS

Liability arising out of any repetitive motion, repetitive stress, repetitive strain or cumulative trauma disorder, including, without limitation, (i) liability or alleged liability arising from asserted improper design of goods, equipment, machinery or operations, (ii) failure to warn or properly instruct as to use of goods, equipment or machinery or conduct of operations, (iii) improper supervision of use of goods, equipment or machinery or conduct of operations, or (iv) without limiting the foregoing, carpal tunnel syndrome arising or allegedly arising from, without limitation, use of keyboards or finger pads.

## P.    SECURITIES, ANTITRUST, ETC.

Liability arising under any statute, law, ordinance, rule or regulation, whether established pursuant to legislative, administrative, judicial, executive or other authority, of any nation or federal, state, local or other governmental or political body or subdivision thereof relating to:

(1)    the purchase, sale or distribution of securities or offers to purchase or sell securities, or investment counseling or management, including liability under the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Public Utility Holding Company Act of 1935, the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the so-called "blue-sky" laws of the various states or other jurisdictions;

(2)    antitrust or the prohibition of monopolies, activities in restraint of trade, unfair methods of competition or deceptive acts and practices in trade and commerce including, without limitation, the Sherman Act, the Clayton Act, the Robinson-Patman Act, the Federal Trade Commission Act, the Lanham Act and the Hart-Scott-Rodino Antitrust Improvements Act;

(3)    fraud or breach of fiduciary duty;

(4)    criminal penalties;

(5)    the failure to pay when due any governmental tax including income, excise, property, value added and sales tax, or tariff, license fee or other governmental fee

-23-

which is incidental to the conduct of business, or any assessment, fine, or penalty related thereto;

(6)   copyright, patent or trademark infringement other than **Advertising Liability** with respect to titles or slogans;

(7)   any defect in or impairment to title to real property, including fixtures, whether or not owned by an **Insured**;

(8)   disclosure relating to, or other regulation of sales of or offers to sell, real property;

(9)   liability or alleged liability arising out of employee, officer or director dishonesty; or

(10)   any liability of an employee, officer or director of an **Insured** entity to such **Insured** entity.

No inference shall be made from the express exclusion of liabilities in this Exclusion P that this Policy would otherwise cover such liabilities or similar liabilities.

## V.   NOTICE OF OCCURRENCE

### A.   NOTICE AS SOON AS PRACTICABLE

If any **Executive Officer** shall become aware of an **Occurrence** likely to involve this Policy, the **Named Insured** shall, as a condition precedent to the rights of any **Insured** under this Policy, give written notice thereof to the **Company** in the manner provided in Section D of this Article V.

Such notice shall be given as soon as practicable and, in any event, during the **Policy Period** or the **Discovery Period**, if applicable, and in accordance with Paragraph 2(b) of Exclusion K, if applicable. Failure to provide written notice as prescribed above shall result in a forfeiture of any rights to coverage hereunder in respect of such **Occurrence**.

### B.   PERMISSIVE NOTICE

Any **Insured** may at any time during the **Policy Period** or **Discovery Period** give notice of an **Occurrence** to the **Company** in the manner provided in Section D of this Article V.

### C.   PERMISSIVE NOTICE OF INTEGRATED OCCURRENCE

The **Insured** may at its option give written notice to the **Company** of any **Occurrence** as an "**Integrated Occurrence**" by designating it as such and giving such notice in the manner provided in Section D of this Article V. Once the **Insured** gives Notice of **Integrated Occurrence**, all **Personal Injury** or **Property Damage** that falls within the

**Integrated Occurrence** (as provided in the terms, conditions and exclusions of this Policy) shall be treated as such for all purposes under this Policy irrespective of whether this Policy has been terminated after the Insured has given Notice of Integrated Occurrence. The limit of liability applicable to such **Integrated Occurrence** shall be the limit described in Article II of this Policy.

D.     **MANNER OF NOTICE**

     (1)     Notice of **Occurrence** must explicitly be designated as such in writing and must be directed to the **Company's** Claims Department at the address set forth in Item 8(a) of the Declarations.

     (2)     Information (including, without limitation, information about pending and/or prior claims, reserves or payments, loss runs, etc.) submitted (whether face-to-face, by mail, telex, courier, facsimile or otherwise) to the **Company's** underwriter(s) (whether in an initial or annual renewal application/submission or otherwise) shall not constitute notice of **Occurrence**. All material directed to the **Company** at the address indicated in Item 8(b) of the Declarations shall be deemed to have been submitted to the **Company's** underwriters (unless otherwise acknowledged by the **Company** in writing).

## VI.     CONDITIONS

A.     **PREMIUM**

The premium for this Policy is a flat premium and is not subject to adjustment, except as specifically provided herein. The premium shall be paid to the **Company**.

B.     **INSPECTION**

The **Company** shall be permitted but not obligated to inspect the **Insured's** property, operations, books, records and files at any time. Neither the **Company's** right to make inspections nor the making thereof or of a report thereon shall constitute an undertaking on behalf of or for the benefit of the **Insured** or others to determine or warrant that such property or operations are safe or are in compliance with any statute, law, ordinance, rule or regulation.

C.     **CROSS LIABILITY**

In the event of a **Claim** being made by reason of **Personal Injury** suffered by an employee of one **Insured** hereunder for which another **Insured** hereunder is or may be liable, this Policy shall cover such **Insured** against whom such a **Claim** is made or may be made in the same manner as if separate policies had been issued to each **Insured** hereunder.

Nothing contained herein shall operate to increase the **Company's** limits of liability as set forth in Item 2 of the Declarations.

D.  **ASSISTANCE AND COOPERATION**

(1)  The **Company** shall not be called upon to assume charge of the settlement or defense of any **Claim** made or suit brought or proceeding instituted against an **Insured**, but the **Company** shall have the right and shall be given the opportunity to associate with the **Insured** or the **Insured's** underlying insurers or both in the defense and control of any **Claim**, suit or proceeding relative to any **Occurrence** where the **Claim** or suit involves, or appears reasonably likely to involve, the **Company**, in which event the **Insured** and  the **Company** shall cooperate in all things in the defense of such **Claim**.

(2)  The **Insured** shall furnish promptly all information reasonably requested by the **Company** with respect to any **Occurrence**, both with respect to any **Claim** against the **Insured** and pertaining to coverage under this Policy.

(3)  If liabilities, losses, costs and/or expenses are in part covered by this Policy and in part not covered by this Policy, the **Insured** and **Company** shall use their best efforts to agree upon a fair and proper allocation thereof between covered and uncovered amounts, and the **Insured** shall cooperate with such efforts by providing all pertinent information with respect thereto.

(4)  Those expenses incurred by the **Company** on its own behalf in connection with claims representation pursuant to this Condition D shall be at its own expense and shall not be part of **Ultimate Net Loss**.

E.  **APPEALS**

In the event the **Insured** or the **Insured's** underlying insurers elect not to appeal a judgment in excess of the retention or the underlying limits, as the case may be, the **Company** may elect to make such appeal at its own cost and expense and shall be liable for the taxable costs and disbursements of such appeal and post-judgment interest on the judgment appealed from accruing during such an appeal.  In no event, however, shall liability of the **Company** for **Ultimate Net Loss** exceed the applicable limit of liability plus the costs and expenses of such appeal.

F.  **LOSS PAYABLE**

Liability under this Policy with respect to any **Occurrence** shall not attach unless and until:

-26-

(1)   the Insured's underlying insurer(s) or the Insured shall have paid the greater of the amount of any applicable underlying limits or the applicable retention set forth in Item 2(a) of the Declarations; and

(2)   the Insured's liability covered hereunder shall have been fixed and rendered certain either by final judgment against the Insured after actual trial or by settlement approved in writing by the Company, and the Insured shall have paid such liability.

Any consideration paid by the Insured or the Insured's underlying insurers other than in legal currency shall be valued at the lower of cost or market, and any element of the Insured's profit or other benefit to the Insured shall be deducted in determining the value of such consideration. The Company may examine the underlying facts giving rise to a judgment against or settlement by the Insured to determine if, and to what extent, the basis for the Insured's liability under such judgment or settlement is covered by this Policy.

The Insured shall make a definite demand for payment for any amount of the Ultimate Net Loss for which the Company may be liable under this Policy within twelve (12) months after the Insured shall have paid such amount. If any subsequent payments shall be made by the Insured on account of the same Occurrence or Claim, additional demands for payment shall be made similarly from time to time. Such losses shall be due and payable by the Company thirty (30) days after they are respectively paid by the Insured, demanded and proven in conformity with this Policy.

G.   **REPRESENTATION**

The Named Insured or such other person as it shall designate in Item 5 of the Declarations shall represent and have authority to bind the Named Insured and any and all Insureds hereunder in all matters under this Policy, including, without limitation, payment of premium, negotiation of the terms of renewal or reinstatement and the adjustment, settlement and payment of claims. The Named Insured, by notice to the Company in writing, may designate a substitute representative, which representative shall, effective as of the date such notice is received, be deemed to be designated in Item 5 of the Declarations.

H.   **OTHER INSURANCE**

If other valid and collectible insurance with any other insurer, whether issued prior hereto, simultaneously herewith or subsequent hereto, is available to the Insured for Ultimate Net Loss covered by this Policy, other than insurance which is expressly and specifically excess of the limits of, or quota share on the same layer as, this Policy, the insurance afforded by this Policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this Policy subject to the terms, conditions or limitations of other insurance.

If this Policy shall be deemed or required to contribute to **Ultimate Net Loss** with other insurance and such contribution arises in whole or in part from the failure of the **Named Insured** to list such other insurance on Schedule B hereto in accordance with the instructions for such Schedule B, then the Named Insured shall indemnify the **Company** for the amount of any such contribution, and this Policy shall apply as if such other insurance had been so listed.

I.  **SUBROGATION**

In the event of any payment hereunder, the **Company** shall be entitled to exercise rights of subrogation, and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  In such case, the **Company** will act in concert with all other interested parties, including the **Insured**, concerned in the exercise of rights of recovery.  The apportioning of any amounts which may be so recovered, net of expenses, shall follow the principle that any parties, including the **Insured**, that shall have paid an amount over and above any payment hereunder shall first be reimbursed up to the amount paid by them.  The **Company** is then to be reimbursed out of any balance then remaining up to the amount paid by it; lastly, the parties of whose interests this coverage is in excess, including the **Insured**, are entitled to claim the residue, if any.

J.  **CHANGES**

Notice to or knowledge possessed by any person shall not effect waiver or change in any part of this Policy or estop the **Company** from asserting any right under the terms of this Policy.  The terms of this Policy may not be waived or changed, except by written endorsement issued to form a part hereof and signed by the **Company**.

K.  **ASSIGNMENT**

Assignment of interest under this Policy shall not bind the **Company** unless and until its consent is endorsed hereon.

L.  **CANCELLATION**

(1)  Coverage A under this Policy may be cancelled on a pro rata basis:

    (a)  at the end of any **Annual Period** by either the **Named Insured** or the **Company** by delivering prior written notice to the other;

    (b)  at any time by the **Named Insured** by delivering written notice to the **Company** at the address listed in Item 8(b) of the Declarations stating when, but in no event prior to the date such notice is received, cancellation shall be effective;

(c)    at any time by the **Company** by delivering written notice to the **Named Insured** stating when, not less than ninety (90) days from the date the notice is received, cancellation shall be effective; or

(d)    if any **Insured** shall institute a suit or proceeding against the **Company** other than as provided in Condition N below (or to enforce an award arising out of such arbitration), at any time thereafter by the **Company** by delivering written notice to the **Named Insured** stating when, not less than five (5) days from the date the notice is received, cancellation shall be effective.

(2)   This Policy will be cancelled automatically retroactive to the commencement of the **Annual Period**, if the premium or proof of payment thereof is not received by the **Company** within five (5) business days of the commencement of such **Annual Period**.

(3)   Coverage B may not be cancelled by either the **Named Insured** or the **Company**, except the **Company** may cancel effective immediately upon the delivery of written notice to the **Named Insured** if the **Insured** should institute a suit or proceeding against the **Company** other than as provided in Condition N below (or to enforce an award arising out of such arbitration).

## M.    CURRENCY

The premiums and losses under this Policy are payable in the respective currency(ies) set forth in Item 6 of the Declarations. Unless otherwise specified in Item 6, such currency(ies) shall be United States dollars.  If judgment is rendered, settlement is denominated or another element of **Damages** is stated in a currency other than in the applicable currency, payment under this Policy shall be made in the applicable currency at the rate of exchange prevailing on the date the final judgment is rendered, the amount of the settlement is agreed upon or the other element of **Damages** is due, respectively.

## N.    ARBITRATION

(1)   Any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof shall be finally and fully determined in London, England under the provisions of the Arbitration Acts of 1950, 1975 and 1979 and/or any statutory modifications or amendments thereto, for the time being in force, by a Board composed of three arbitrators to be selected for each controversy as follows:

Any party may, in the event of such a dispute, controversy or claim, notify the other party or parties to such dispute, controversy or claim of its desire to arbitrate the matter, and at the time of such notification the party desiring  arbitration shall notify any other party or parties of the name of

-29-

the arbitrator selected by it. The other party who has been so notified shall within thirty (30) calendar days thereafter select an arbitrator and notify the party desiring arbitration of the name of such second arbitrator. If the party notified of a desire for arbitration shall fail or refuse to nominate the second arbitrator within thirty (30) calendar days following the receipt of such notification, the party who first served notice of a desire to arbitrate will, within an additional period of thirty (30) calendar days, apply to a judge of the High Court of Justice of England and Wales for the appointment of a second arbitrator and in such a case the arbitrator appointed by such a judge shall be deemed to have been nominated by the party or parties who failed to select the second arbitrator. The two arbitrators, chosen as above provided, shall within thirty (30) calendar days after the appointment of the second arbitrator choose a third arbitrator. In the event of the failure of the first two arbitrators to agree on a third arbitrator within said thirty (30) calendar day period, either of the parties may within a period of thirty (30) calendar days thereafter, after notice to the other party or parties, apply to a judge of the High Court of Justice of England and Wales for the appointment of a third arbitrator and in such case the person so appointed shall be deemed and shall act as the third arbitrator. Upon acceptance of the appointment by said third arbitrator, the Board of Arbitration for the controversy in question shall be deemed fixed. All claims, demands, denials of claims and notices pursuant to this Condition N shall be given in accordance with Condition U below.

(2)    The Board of Arbitration shall fix, by a notice in writing to the parties involved, a reasonable time and place for the hearing and may prescribe reasonable rules and regulations governing the course and conduct of the arbitration proceeding, including without limitation discovery by the parties.

(3)    The Board shall, within ninety (90) calendar days following the conclusion of the hearing, render its decision on the matter or matters in controversy in writing and shall cause a copy thereof to be served on all the parties thereto. In case the Board fails to reach a unanimous decision, the decision of the majority of the members of the Board shall be deemed to be the decision of the Board and the same shall be final and binding on the parties thereto. Such decision shall be a complete defense to any attempted appeal or litigation of such decision in the absence of fraud or collusion. Without limiting the foregoing, the parties waive any right to appeal to, and/or seek collateral review of the decision of the Board of Arbitration by, any court or other body to the fullest extent permitted by applicable law.

(4)   Any order as to the costs of the arbitration shall be in the sole discretion of the Board, who may direct to whom and by whom and in what manner they shall be paid.

(5)   The Company and the Insured agree that in the event that claims for indemnity or contribution are asserted in any action or proceeding against the Company by any of the Insured's other insurers in any jurisdiction or forum other than that set forth in this Condition N, the Insured will in good faith take all reasonable steps requested by the Company to assist the Company in obtaining a dismissal of these claims (other than on the merits) and will, without limitation, undertake to the court or other tribunal to reduce any judgment or award against such other insurers to the extent that the court or tribunal determines that the Company would have been liable to such insurers for indemnity or contribution pursuant to this Policy.  The Insured shall be entitled to assert claims against the Company for coverage under this Policy, including, without limitation, for amounts by which the Insured reduced its judgment against such other insurers in respect of such claims for indemnity or contribution, in an arbitration between the Company and the Insured pursuant to this Condition N, which arbitration may take place before, concurrently with and/or after the action or proceeding involving such other insurers; provided, however, that the Company in such arbitration in respect of such reduction of any judgment shall be entitled to raise any defenses under this Policy and any other defenses (other than jurisdictional defenses) as it would have been entitled to raise in the action or proceeding with such insurers (and no determination in any such action or proceeding involving such other insurers shall have collateral estoppel, res judicata or other issue preclusion or estoppel effect against the Company in such arbitration, irrespective of whether or not the Company remained a party to such action or proceeding).

O.   **LAW OF CONSTRUCTION AND INTERPRETATION**

This Policy, and any dispute, controversy or claim arising out of or relating to this Policy, shall be governed by and construed in accordance with the internal laws of the State of New York, except insofar as such laws:

(1)   may prohibit payment in respect of punitive damages hereunder;

(2)   pertain to regulation under the New York Insurance Law, or regulations issued by the Insurance Department of the State of New York pursuant thereto, applying to insurers doing insurance business, or issuance, delivery or procurement of policies of insurance, within the State of New York or as respects risks or insureds situated in the State of New York; or

(3)   are inconsistent with any provision of this Policy;

provided, however, that the provisions, stipulations, exclusions and conditions of this Policy are to be construed in an evenhanded fashion as between the Insured and the Company; without limitation, where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in the manner most consistent with the relevant provisions, stipulations, exclusions and conditions (without regard to authorship of the language, without any presumption or arbitrary interpretation or construction in favor of either the Insured or the Company or reference to the "reasonable expectations" of either thereof or to contra proferentem and without reference to parol or other extrinsic evidence). To the extent that New York law is inapplicable by virtue of any exception or proviso enumerated above or otherwise, and as respects arbitration procedure pursuant to Condition N, the internal laws of England and Wales shall apply.

P.    **LIABILITY OF THE COMPANY**

The Named Insured and the Insured agree that the liability and obligations of the Company hereunder shall be satisfied from the funds of the Company alone and that the individual shareholders of the Company shall have no liability hereunder to the Named Insured or the Insured.

Q.    **POLICY EXTENSION**

Subject to Condition L, Coverage A of this Policy may be extended at the expiration of each Annual Period for another Annual Period, subject only to agreement between the Company and the Named Insured as to the applicable premium and such other terms and conditions as the Company and the Named Insured may mutually deem appropriate. Coverage A shall expire at the end of an Annual Period if not extended (or upon cancellation thereof). Where Coverage A (or Coverage B) is cancelled or not extended, such cancellation or non-extension shall not affect the rights of the Insured as respects any Occurrence or Integrated Occurrence of which notice was given in accordance with the provisions of this Policy prior to such cancellation or non-extension and shall not limit whatever rights the Insured otherwise would have under this Policy as respects actual or alleged Personal Injury, Property Damage or Advertising Liability included in such Occurrence or Integrated Occurrence taking place subsequent to such cancellation or non-extension.

R.    **REINSTATEMENT**

.  (1)    At the time of each annual Policy extension of Coverage A, the aggregate limit of liability set forth in Item 2(b) of the Declarations shall, unless otherwise agreed in writing between the Named Insured and the Company, automatically be reinstated with respect to covered Occurrences of which notice is first given during the following Annual Period. There shall be no separate premium charged for this automatic reinstatement in addition to that provided for in Condition Q above. There shall be no reinstatement of the aggregate limit of

-32-

liability, unless otherwise agreed in writing by the **Company**, as respects Coverage B, and the remaining amount, if any, of the aggregate limit for the final **Annual Period** under Coverage A shall apply as respects the **Discovery Period**.

(2)    If during any **Annual Period**, as respects Coverage A only, the aggregate limit of liability set forth in Item 2(b) ("Original Aggregate Limit") of the Declarations is or may be impaired by virtue of Occurrence(s) of which notice has been given previously during such **Annual Period**, then the **Named Insured** shall be entitled to elect one reinstatement of all or any portion of such aggregate limit, based on the following terms and conditions:

    (a)    Such reinstatement must be elected in writing by the **Named Insured**, which election shall specify the amount being reinstated, not to exceed an amount equal to the Original Aggregate Limit ("Reinstatement Amount"), and must be accompanied by payment of the reinstatement premium as provided in subparagraph (c) below.  Such reinstatement shall be effective as of the date of the receipt by the **Company** of such written election and premium ("Reinstatement Date").

    (b)    (i)  There shall be an aggregate sublimit of liability for all **Occurrences** of which notice is first given to the **Company** at any time during the entire **Annual Period** in an amount equal to the Original Aggregate Limit as respects all **Occurrences** of which the **Named Insured** is aware at the Reinstatement Date (including, without limitation, all **Occurrences** of which notice was first given during such **Annual Period** prior to such date and all **Integrated Occurrences** including **Personal Injury** or **Property Damage** which was included in any such prior noticed **Occurrences**). The **Named Insured** shall be deemed to have been aware of an **Occurrence** if any **Executive Officer** was aware of any actual or alleged **Personal Injury**, **Property Damage** or **Advertising Liability** which was included in such **Occurrence**, irrespective of whether or not such person believed or expected such **Occurrence** was likely to involve this Policy.

    (ii)  The aggregate limit of liability for all **Occurrences** of which the **Named Insured** is not aware at the Reinstatement Date and of which notice is first given to the **Company** during the portion of the **Annual Period** on or subsequent to the Reinstatement Date and during any **Discovery Period** in the event Coverage A terminates at the end of such **Annual Period** shall be:

        (x)    any unused portion of the Original Aggregate Limit pertaining to the portion of the **Annual Period** prior to the Reinstatement Date and to any **Occurrences** of which the **Named Insured** is aware at such date; plus

(y)    the Reinstatement Amount.

In no event shall the aggregate limit of liability under this subparagraph (2)(b)(ii) exceed the Original Aggregate Limit.

(iii)  In no event shall the aggregate limit of liability of the Company in respect of all Occurrences of which notice is first given to the Company during the entire Annual Period exceed the sum of the Original Aggregate Limit and the Reinstatement Amount.

(c)    The reinstatement premium shall be an amount determined by the Company, but in no event shall this exceed one hundred and twenty-five percent (125%) of the total premium for the Annual Period in which the reinstatement takes place.

## S.    DISCOVERY PERIOD

(1)    In the event of Termination of Coverage A, other than by reason of cancellation for non-payment of premium or due to institution of a proceeding other than as contemplated by Condition N, the Named Insured may elect, prior to the Termination Date of such Coverage A, to secure Coverage B for the following Annual Period for such Insureds as the Named Insured shall designate, by giving the Company written notice of such election and paying to the Company the annual premium set forth in the attached Schedule D no later than the date of commencement of such Annual Period.

(2)    In the event that the Named Insured elects to secure Coverage B pursuant to paragraph (1) above, the Named Insured may elect to continue such Coverage B for any number of additional Annual Periods by giving the Company written notice of each election for a subsequent Annual Period and paying to the Company the corresponding annual premium set forth in the attached Schedule D no later than the end of the Annual Period for which such Coverage B was previously elected.  If the Named Insured shall fail to elect Coverage B for any Annual Period, it may not elect Coverage B for any subsequent Annual Period.

(3)    For the purpose of application of retentions and limits of liability, notice of an Occurrence given during the Discovery Period shall be deemed to have been given during the final Annual Period in the Policy Period.  The aggregate limit of liability shall not be reinstated for the Discovery Period.

## T.    FORMER SUBSIDIARIES, AFFILIATES AND ASSOCIATED COMPANIES

If any subsidiary, affiliate or associated company of the Named Insured which is an Insured hereunder shall cease to be such a subsidiary, affiliate or associated company of the Named Insured, then at such time Coverage A shall automatically terminate as to

-34-

such former subsidiary, affiliate or associated company.  Coverage A shall continue with respect to the Named Insured and any other entity which remains an Insured for its own liability, if any, arising out of its prior ownership of or affiliation or association with the former subsidiary, affiliate or associated company.  At such time of such automatic termination of coverage, Coverage B shall, unless the Named Insured otherwise specifies, automatically incept as to such former subsidiary, affiliate or associated company and continue in force for the balance of the Annual Period, without additional payment or return of any premium.  Prior to the end of the Annual Period, such former subsidiary, affiliate or associated company may, with written consent received by the Company from the Named Insured, elect to extend Coverage B beyond the end of the Annual Period on such terms and conditions, for such period, subject to such limits and for such additional premium as may be agreed with the Company.

U.   **NOTICE**

All notices under any provision of this Policy shall be in writing and given by hand, prepaid express courier, airmail or telecopier properly addressed to the appropriate party and will be deemed as having been effected only upon actual receipt.  Notice to any Insured may be given to the Named Insured at the address shown in Item 1(b) of the Declarations or to such other person as the Named Insured shall designate in Item 5 of the Declarations.

V.   **HEADINGS**

The descriptions in the headings and sub-headings of this Policy are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

## SCHEDULE A
## ADDITIONAL INSUREDS

**SCHEDULE B**
**UNDERLYING INSURANCE**

**SCHEDULE C**
**WATERCRAFT**

## SCHEDULE D

If the **Named Insured** shall elect to obtain Coverage B pursuant to Condition S of this Policy, the annual premium charge for each **Annual Period** for Coverage B shall be computed by multiplying the premium for the last **Annual Period** in the **Policy Period** by the applicable factor set forth in the following table:

**Coverage B**

<u>**Annual Premium Charge**</u>

| | |
|---|---|
| 1st Annual Period............................................. | 30% |
| 2nd Annual Period ........................................... | 20% |
| 3rd Annual Period............................................. | 10% |
| 4th Annual Period ............................................ | 10% |
| 5th and each additional Annual Period ........... | 9% |



Insured:              Universal Health Services, Inc.
Policy No:            9810-1092-UMB-2006
Endorsement No:      1
Effective Date:       January 1, 2006

## PREVIOUSLY NOTIFIED OCCURRENCES OR CLAIMS AND/OR KNOWN OCCURRENCES EXCLUSION ENDORSEMENT

Notwithstanding any other provision of this Policy, it is hereby agreed that this Policy shall not apply to, and the Company shall have no liability hereunder to the Named Insured in respect of:

**A.      PREVIOUSLY NOTIFIED OCCURRENCES OR CLAIMS**

Any Occurrence, including any "Integrated Occurrence", "Batch Occurrence" or similar term as defined under any other Policy, Personal Injury, Property Damage or Advertising Liability or any Claim or potential Claim arising therefrom, which was the subject of any notice by any Insured to any insurer prior to the Inception Date.

**B.      KNOWN OCCURRENCES**

Actual or alleged liability arising from any Occurrence, including an "Integrated Occurrence" of which any Executive Officer was aware of prior to the Inception Date, irrespective of whether or not such person believed or expected such Occurrence was likely to involve this Policy.

All other terms and conditions of this Policy remain unchanged.

MAX RE LTD.

By: _____
    Michael S. Morgan

Title:   Senior Vice President

Date:   December 11, 2006

MAX-OCR



| | |
|---|---|
| Insured: | Universal Health Services, Inc. |
| Policy No: | 9810-1092-UMB-2006 |
| Endorsement No: | 2 |
| Effective Date: | January 1, 2006 |

## INCORPORATION OF SCHEDULES BY REFERENCE ENDORSEMENT, WITH WARRANTY

Schedules A, B and C dated as of the date(s) listed below are hereby incorporated by reference and shall be deemed to be attached to the Policy; provided, however, that if the Named Insured has not provided an up-to-date Schedule B prior to the issuance of this Endorsement, (i) the Named Insured covenants to provide such an updated Schedule B, completed in accordance with applicable instructions, as soon as is practicable, which schedule automatically shall be incorporated by reference and deemed to be attached to the Policy, and (ii) the Named Insured warrants and represents that it has arranged for replacement insurance (excess but not primary) with coverage at least as broad and limits at least as great as the insurance listed on the most recent Schedule B supplied to the Company in respect of this Policy and covenants that such replacement insurance will be listed on the updated Schedule B to be provided as set forth above.

Schedule A Date:       **October 1, 2005**

Schedule B Date:       **October 1, 2005**

Schedule C Date:       **October 1, 2005**

It is agreed that the only purposes of Schedules A, B and C are to set forth the following information as respects the corresponding indicated provisions of the Policy, and nothing contained in such Schedules shall affect application of any other provisions of the Policy:

| Schedule | Information | Policy Provision |
|---|---|---|
| A | additional insured entities | III.P (2) (b) |
| B | underlying insurance | II.A (1) |
| C | exceptions to Watercraft exclusion | IV.J |

MAX RE LTD.

By: _____
Michael S. Morgan

Title:   Senior Vice President

Date:   December 11, 2006



| | |
|---|---|
| Insured: | Universal Health Services, Inc. |
| Policy No: | 9810-1092-UMB-2006 |
| Endorsement No: | 3 |
| Effective Date: | January 1, 2006 |

## SPECIAL RISKS MULTIPLE RETENTION ENDORSEMENT

1.   With respect to the specific risk(s) described below, it is agreed that the Per Occurrence Retention Amount set forth in Item 2(a) of the Declarations shall be amended to be the amounts respectively set forth with respect thereto;   provided, however, that all other declarations, provisions, stipulations, exclusions and conditions of the Policy shall remain in effect;   provided further, that the Per Occurrence Retention Amount set forth in Item 2(a) of the Declarations shall not be affected by this Endorsement except as to the specific risks listed below.

2.   Where different Per Occurrence Retention Amounts apply to different elements of **Personal Injury, Property Damage** and/or **Advertising Liability** arising out of a single Occurrence, **Ultimate Net Loss** (but only to the extent not paid or indemnified under the Policy) which is subject to one Per Occurrence Retention Amount shall also erode any equal or higher Per Occurrence Retention Amount(s), but Ultimate Net Loss which is subject to a higher Per Occurrence Retention Amount shall not erode a lower Per Occurrence Retention Amount; i.e., the Per Occurrence Retention Amounts are not cumulative under Article II.A(2) of the Policy as respects a single Occurrence, but no recovery may be had with respect to any specific risk until the Insured (and/or the Insured's underlying insurers) has satisfied the full Per Occurrence Retention Amount with respect thereto by actual payment of Ultimate Net Loss.

3.   Nothing herein shall affect the application of the Policy as excess of all underlying insurances; without limiting the foregoing, where separate underlying insurances apply in respect to a single Occurrence, this Policy shall be excess of the cumulative coverage thereunder as provided in Articles II.A(1) and VI.H of the Policy.

4.   This Endorsement applies to all Occurrences with respect to which notice of Occurrence or Claim is given to the Company on or after the Effective Date shown above notwithstanding that the event or conditions commenced or the **Personal Injury** or **Property Damage** took place in whole or in part prior to the Effective Date.

**SPECIFIC RISK(S): Professional Liability**

**AMENDED PER OCCURRENCE RETENTION AMOUNT(S):**
**$5M/$5M Buffer xs $15M Each & Every**

Insured:              **Universal Health Services, Inc.**
Policy No:            **9810-1092-UMB-2006**
Endorsement No:      **3**
Effective Date:      **January 1, 2006**

---

## SPECIAL RISKS MULTIPLE RETENTION ENDORSEMENT

Solely for the purposes of this Endorsement, the following definition(s) shall apply:

Professional Liability

"Professional Liability" means liability or alleged liability arising or allegedly arising out of any act, error or omission in the rendering of professional services, including but in no event limited to, the rendering of architectural, engineering, legal, accounting, data processing, consulting or investment advisory services.

**MAX RE LTD.**

By: _Michael S. Morgan_
    Michael S. Morgan

Title:   Senior Vice President

Date:   December 11, 2006



Page 1 of 3

Insured:          **Universal Health Services, Inc.**
Policy No.        **9810-1092-UMB-2006**
Endorsement No:   **4**
Effective Date:   **January 1, 2006**

---

### ENDORSEMENT AS RESPECTS PREMIUM

The **Named Insured** has paid a deposit premium of ▓▓▓▓▓. However, the **Named Insured** shall pay a **Policy Period** total premium ("**Total Premium**"), determined as provided below.

The Total Premium shall be determined as follows:

(A) The minimum premium for the policy period is $▓▓▓▓▓ ("Minimum Premium"), and the maximum premium for the policy period is $▓▓▓▓▓ ("Maximum Premium"). Subject always to being not less than the Minimum Premium and not more than the Maximum Premium, the Total Premium for the **Policy Period** shall be calculated as follows: (a) all **Ultimate Net Loss** (net of subrogation recoveries (after deducting expenses); hereinafter "Recoveries") that the **Company** incurs as respects the Policy Period ("Total Ultimate Net Loss Amount") multiplied by 100/75 (1.333) equals the Total Premium payable to the **Company** ("Total Calculated Premium").

(B) The premium calculation shall occur as follows:

   (i) The determination of the Total Ultimate Net Loss Amount and the Total Calculated Premium shall not terminate at the end of the **Policy Period** (whether due to expiration, cancellation or otherwise, unless otherwise agreed in writing by the parties), but shall continue as respects any **Ultimate Net Loss** incurred or Recoveries received thereafter.

   (ii) As of the first one-year anniversary of the termination of the **Policy Period**, the **Company** shall determine the Total Calculated Premium then due for the **Policy Period** as set forth in paragraph (a) above. Subject always to the Minimum Premium and Maximum Premium, if the Total Calculated Premium exceeds the current balance of the premium previously paid ("Current Balance"), the **Named Insured** shall pay to the **Company** the amount of the difference within ten (10) days of receipt of notice thereof and if the Current Balance exceeds the Total Calculated Premium, subject to the provisions of subparagraph (b)(iv) below, the **Company** shall pay the amount of the difference to **Named Insured** within ten (10) days of the determination thereof. The **Company** shall make the determination set forth in this subparagraph (b)(ii), and all subsequent determinations set forth in paragraph (b)(iii) below, within 30 days after the respective anniversary.

MAX-OCR

Insured: **Universal Health Services, Inc.**
Policy No. **9810-1092-UMB-2006**
Endorsement No: **4**
Effective Date: **January 1, 2006**

## ENDORSEMENT AS RESPECTS PREMIUM

(iii)   As of each anniversary after the first anniversary of the termination of the **Policy Period**, continuing until the **Company** and the **Named Insured** agree in writing that there is no further need to so, subject always to the **Minimum Premium** and **Maximum Premium**, the **Company** shall determine whether the **Total Calculated Premium** has increased or decreased from its immediately preceding anniversary calculation, by applying the calculation set forth in paragraph (a) above to the **Total Ultimate Net Loss Amount** after adding thereto any **Ultimate Net Loss** paid by the **Company** and subtracting therefrom any **Recoveries** received by the **Company** during the preceding one-year period. On the same time schedule set forth in subparagraph (b)(ii), and taking into account payments by offset as set forth in subparagraph (b)(iv) below, the **Named Insured** shall pay the **Company** the amount of any increase or the **Company** shall pay the **Named Insured** the amount of any decrease.

(iv)   As respects any amounts due by the **Company** to the **Named Insured** pursuant to subparagraph (b)(ii) or (iii), or for **Ultimate Net Loss** payable under this Policy after termination of the **Policy Period**, the **Company** may offset such amounts from any amounts then due, or subject to become due, to the **Named Insured** under this **Policy**. Without limiting the foregoing, the **Company** may offset from the payment of **Ultimate Net Loss** due the Insured, but subject to not exceeding the Maximum Premium, any increase in premium resulting from such **Ultimate Net Loss**. (For example, if the Maximum Premium were $2,000,000 and if there is $3,000,000 of **Ultimate Net Loss** due from the **Company** to the Insured as respects an **Occurrence**, and assuming as of that time the Current Balance of premium paid is $1,400,000, the formula set forth in paragraph (a) would result in an additional premium of $600,000 (the difference between $1,400,000 and $2,000,000 Maximum Premium) and the **Company** would offset that against the $3,000,000, thus paying the Insured $2,400,000.)

 **MaxRe**

Insured:         **Universal Health Services, Inc.**
Policy No.       **9810-1092-UMB-2006**
Endorsement No:  **4**
Effective Date:   **January 1, 2006**

---

(C)   Notwithstanding the provision of Condition L of this Policy that Coverage A under the Policy may be cancelled on a *pro rata* basis, if the Named Insured cancels this Policy, earned premium will be the greater of (i) the amount computed in accordance with the customary pro-rata rate table and procedure or (ii) the Minimum Premium stated in paragraph (a) above.


All other terms and conditions of this Policy remain unchanged.


**MAX RE LTD.**


By:      
Michael S. Morgan

Title:   Senior Vice President

Date:   December 11, 2006


MAX-OCR



| | |
|---|---|
| Insured: | **Universal Health Services, Inc.** |
| Policy No: | **9810-1092-UMB-2006** |
| Endorsement No: | **5** |
| Effective Date: | **January 1, 2006** |

## INTEGRATED OCCURRENCE RETENTION ENDORSEMENT

It is hereby agreed by and between the Company and the Named Insured, effective as of the above Effective Date:

As respects each Integrated Occurrence, and only as respects Integrated Occurrences, Article II, Section A (2) shall be replaced by the following:

(2) the per Integrated Occurrence retention amount of $25,000,000 (twenty five million dollars) which may be satisfied, in whole or in part, by the **Ultimate Net Loss** that eroded the per Occurrence retention amount(s) of the "Original Occurrence(s)" (as defined in Article II, Section C of this Policy),

All other terms and conditions of the Policy remain unchanged.

**MAX RE LTD.**

By: _____
Michael S. Morgan

Title:  Senior Vice President

Date:  December 11, 2006

MAX-OCR



Insured:                 **Universal Health Services, Inc.**
Policy No:               **9810-1092-UMB-2006**
Endorsement No:          **6**
Effective Date:          **January 1, 2006**

---

## MANAGED CARE ERRORS AND OMISSIONS
### LIABILITY EXTENSION ENDORSEMENT

It is hereby agreed that this Policy is extended to cover liability for **Damages** on account of **Bodily Injury** actually or allegedly caused by a **Managed Care Incident**, subject to the provisions of this Endorsement.

1.   The definition of Occurrence contained in the Policy is amended to include **Managed Care Incident**, as defined below.

2.   As used in this Endorsement, **Managed Care Incident** means any of the following:

    (a)   any act, error, or omission by an **Insured** in the furnishing of services related to the business operations of the **Insured's** managed care organization which actually or allegedly causes **Bodily Injury**, including without limitation any of the following:

        (1)   disability management services, including but not limited to medical care coordination, social security evaluation assessment, vocational assessment, and vocational rehabilitation;

        (2)   medical costs management services including but not limited to ambulatory surgery review, computerized medical bill review services, DRG validation, hospital bill auditing services, independent medical examination services, medical case management services, medical referral services, physician bill review services, and second opinion services;

        (3)   utilization review services, including but not limited to ancillary services review such as adult day care review, chiropractic review, home health care and home maker services review, nursing facility admission review, private duty and skilled nursing review, and psychiatric review; hospital pre-admission, emergency admission, continued-stay, retrospective and discharge planning review; local medical management, Peer Review; and surgical review;

        (4)   network provider services, including but not limited to selection, credentialing and contracting health care providers such as physicians, hospitals and ancillary providers, and performing network management and administration services;

        (5)   psychiatric managed care services, including but not limited to providing psychiatric and substance abuse network, case management and utilization review services;

        (6)   health education, health information, and health decision counseling services, including but not limited to: helping people assess their need for information, helping

MAX-OCR

Insured:            **Universal Health Services, Inc.**
Policy No:          **9818-1092-UMB-2006**
Endorsement No:     **6**
Effective Date:     **January 1, 2006**

people understand information they receive from health practitioners and other sources; providing information about alternative diagnostic procedures and treatment; helping people work with health practitioners to improve their ability to use medical services; and supporting people to be more involved in their own health care decision making through the above, plus serving as ongoing source of information and education;

(7)      employee assistance services, including but not limited to counseling, personal and behavioral problem assessment, referral, and similar support and assistance services provided to customers' employees and others including family members and other persons residing or closely associated with employees.  Such services may include but are not limited to the following:  counseling and similar services made available on worksite or off worksite, referral to professional or social service resources; consultation and advice concerning medical plan benefits; managed care (including treatment planning, precertification and utilization review) with respect to mental and nervous and substance abuse cases, which may include health benefits reduction or increase; management and supervisory training programs; procedures for referral of employees by management and supervisors; educational programs and materials;

(8)      managed care marketing services;

(9)      managed care quality assurance management activities;

(10)     managed care claims handling activities, including but not limited to adjudicating health claim based on medical necessity;

(11)     administration and management of managed care services and operations including but not limited to enrollment processing and eligibility determination;

(12)     managed care plan design services;

(13)     health data analysis;

(14)     health care referral services;

(15)     benefit administration

(16)     other managed care services, including but not limited to other necessity of care, quality or care, cost of care and utilization of care services;

(b)      any act, error, or omission in the rendering of or failure to render Medical Services by any person or entity who is not an Insured but for whose acts, errors, or omissions an Insured is vicariously liable; provided, however, that **Managed Care Incident** shall not mean or include any act, error, or omission in the rendering of or failure to render Medical Services by an Insured.  As used in this Endorsement, "Medical Services"

**MAX-OCR**

Insured:          **Universal Health Services, Inc.**
Policy No:         **9810-1092-UMB-2006**
Endorsement No:    **6**
Effective Date:    **January 1, 2006**

means health care, medical care, or medical treatment provided to any person, including medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the use, prescription, furnishing, or dispensing of medications, drugs, blood, blood products, tissue, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; and the handling of, or the performance of post-mortem examination on, human bodies.

**Managed Care Incident** shall not mean or include any act, error, or omission which actually or allegedly causes only mental injury or mental anguish, but which does not actually or allegedly cause **Bodily Injury.**

All **Bodily Injury** to any one person caused by acts, errors, or omissions as described in Sections 2(a) and 2(b) of this Endorsement shall be deemed caused by one **Managed Care Incident,** regardless of the number of such acts, errors, or omissions or Insureds involved, or the period of time over which such acts, errors or omissions took place. That one **Managed Care Incident** shall be deemed to have happened on the date when the first act, error, or omission included in such acts, errors, or omissions took place. The **Limit of Liability and Retention** applicable to that one **Managed Care Incident** shall be the **Limit of Liability and Retention** for each **Occurrence** stated in Item 2(a) of the Declarations in effect at the time when notice of that **Managed Care Incident** is first given to the **Company** in writing during the **Policy Period** or **Discovery Period,** if purchased.

In no case shall **Bodily Injury** to two or more persons caused by acts, errors, or omissions as described in Section 2(a) or 2(b) of this Endorsement be deemed to have been caused by, or deemed to be encompassed within, one **Managed Care Incident** or **Occurrence.**

3.   No **Bodily Injury** caused by a **Managed Care Incident** shall be encompassed, in whole or in part, by any **Integrated Occurrence.**

4.   This Endorsement excludes, and does not apply to, any liability:

   (a)   based upon, arising out of, or in any way involving any actual or alleged dishonest, fraudulent, criminal, or malicious act, error, or omission by any **Insured,** including without limitation any actual or alleged deceptive trade practice, fraudulent inducement, or misrepresentation made in marketing;

   (b)   based upon, arising out of, or in any way involving any actual or alleged violation of any law, statute, ordinance, rule, or regulation by any **Insured,** including without limitation any actual or alleged violation of any Consumer Protection Act, Deceptive Trade Practices Act, or similar provisions of any federal, state, or local law;

MAX-OCR

Page 4 of 4

| | |
|---|---|
| Insured: | **Universal Health Services, Inc.** |
| Policy No: | **9810-1092-UMB-2006** |
| Endorsement No: | **6** |
| Effective Date: | **January 1, 2006** |

(c)    based upon, arising out of, or in any way involving any actual or alleged gaining of any profit, remuneration, or advantage by any Insured to which the Insured was not legally entitled;

(d)    based upon, arising out of, or in any way involving any actual or alleged: (i) failure to obtain or effect any form, policy, plan, or program of insurance, reinsurance, self-insurance, suretyship, or bond; or (ii) commingling or mishandling of funds;

(e)    for fees, amounts, benefits, or coverages actually or allegedly owed to any person or entity under any contract, health care plan, insurance policy, reinsurance policy, or plan or program of self insurance.

5.    The coverage provided by this Endorsement is subject to the **Limits of Liability and Retentions** stated in Item 2 of the Declarations. This Endorsement does not increase the **Limits of Liability** stated in Item 2 of the Declarations.

All other terms and conditions of the Policy which are not inconsistent with this Endorsement continue to apply to this Endorsement.

**MAX RE LTD.**

By: _____

Michael S. Morgan

Title:   Senior Vice President

Date:   December 11, 2006

**MAX-OCR**

 **MaxRe**

Insured:            Universal Health Services, Inc.
Policy No:          9810-1092-UMB-2006
Endorsement No:     7
Effective Date:     January 1, 2006

## MOLD (INCLUDING TOXIC MOLD)
## AND/OR FUNGI EXCLUSION ENDORSEMENT

As of the above Effective Date, the following Exclusion is added to Article IV **EXCLUSIONS** of the Policy:

**MOLD (INCLUDING TOXIC MOLD) AND/OR FUNGI**

**Personal Injury, Property Damage** or **Advertising Injury** actually or allegedly arising out of, or actually or allegedly directly or indirectly caused by, Mold.

"**Mold**" means any species, kind or variety of mold, including, but not limited to, so-called "toxic mold", or any other fungus or similar biological organism (collectively "Mold Organism"), or any substance or material contained in, growing out of, or secreted, emitted or otherwise separated from, any Mold Organism (collectively "Mold Substance") or any substance or material resulting from the transformation of, decomposition of, and/or combination of other materials or substances with, any Mold Organism or Mold Substance.

All other terms and conditions of the Policy remain unchanged.

MAX RE LTD.

By: _____
    Michael S. Morgan

Title:  Senior Vice President

Date:  December 11, 2006

MAX-OCR



Insured: **Universal Health Services, Inc.**
Policy No: **9810-1092-UMB-2006**
Endorsement No: **8**
Effective Date: **January 1, 2006**

## AMENDMENT OF EXCLUSION G. ENDORSEMENT

It is hereby agreed that Exclusion G. of the Policy, "WAR", is deleted and replaced with the following:

"G.  **WAR**

**Personal Injury, Property Damage** or **Advertising Liability** directly or indirectly occasioned by, happening through or in consequence of war, invasion, hostile action of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, terrorism, military terrorism, military or usurped power or confiscation or nationalization or requisition or destruction of or damage to property by or under the order of any government or public or local authority."

**MAX RE LTD.**

By: _____
Michael S. Morgan

Title: Senior Vice President

Date: December 11, 2006

MAX-OCR



Insured:            **Universal Health Services, Inc.**
Policy No:          **9810-1092-UMB-2006**
Endorsement No:     **9**
Effective Date:     **January 1, 2006**

---

## SEVERAL LIABILITY FOR QUOTA SHARE COVERAGE

In consideration of the premium charged, it is agreed that the Company's liability for Ultimate Net Loss under this Policy is solely for its proportionate or quota share of the applicable limits of liability as set forth in Item 2 of the Declarations.  Further, the Company's liability is several and not joint, and, in no event shall the Company be liable for the proportionate or quota share of any other insurer or entity participating on the same layer of coverage as this Policy.

All other terms and conditions of this Policy remain unchanged,

MAX RE LTD.

By: Michael S. Morgan

Title:  Senior Vice President

Date:  December 11, 2006

MAX-OCR



Insured:                **Universal Health Services, Inc.**
Policy No.              **9810-1092-UMB-2006**
Endorsement No:         **10**
Effective Date:         **January 1, 2006**

## PREMIUM ADJUSTMENT ENDORSEMENT

It is hereby agreed by and between the **Company** and the **Named Insured** as of the above Effective Date ("**Effective Date**"):

As respects each **Annual Period**, the premium set forth in Item 7 of the Declarations ("**Annual Period Premium**") is not subject to adjustment, except in any instance where the total **Business Units** (as defined below) of the **Named Insured** (and all consolidated subsidiaries and affiliates) ("**Total Business Units**") for such **Annual Period** exceeds the Threshold Business Unit Amount set forth in Item 2 below; in such case, the **Company** in its discretion may impose an additional premium equal to the product of (i) the number of **Business Units** by which the **Total Business Units** exceeds the Threshold Business Units Amount times (ii) the Dollars Per Excess Business Unit Amount set forth in Item 3 below (for example, if the Threshold Business Units Amount is 1,000, the **Total Business Units** is 1,100, and the Dollar Per Excess Business Unit Amount is $100, then the additional premium is calculated as follows:  1,100-1,000 = 100 x $100 = $10,000).  The foregoing calculation shall be made for each **Annual Period** in which the **Total Business Units** exceeds the Threshold Business Units Amount, always using the same Threshold Business Units Amount. Any additional premium shall be paid as follows:  (a) if the increase is due to an acquisition, merger or similar transaction (collectively, "**Acquisition**"), the **Named Insured** shall inform the **Company** at or prior to the **Acquisition** of its best estimate of the increase in **Total Business Units** expected from such **Acquisition**, and, as respects the **Annual Period** in which such **Acquisition** occurs, shall pay the additional premium within 10 days after notification of the amount thereof by the **Company** (after the end of such **Annual Period**, if necessary, an adjustment will be made to reflect any difference between the expected and actual increase due to the **Acquisition**), and (b) as respects each **Annual Period** (including one in which (a) applies), the **Named Insured**, on or prior to the end thereof, shall inform the **Company** of its best estimate of the **Total Business Units** (including those attributable to an **Acquisition(s)**) and shall pay any additional premium due within the later of 30 days after the end of such **Annual Period** or 10 days after notification of the amount thereof by the **Company** (any change in additional premium resulting from a difference between the estimates and the actual figures when finally determined shall be adjusted between the **Named Insured** and the **Company** within 10 days after the determination thereof).

<u>Definition of Total Business Units</u>

"**Business Units**" are as defined in Item 1 below.  The basis of determining the **Total Business Units** for each **Annual Period** (e.g., average daily basis, for the entire **Annual Period**, etc.) shall be included in the Item 1 definition.

MAX-OCR

| | |
|---|---|
| Insured: | Universal Health Services, Inc. |
| Policy No. | 9810-1092-UMB-2006 |
| Endorsement No: | 10 |
| Effective Date: | January 1, 2006 |

## PREMIUM ADJUSTMENT ENDORSEMENT

Items: 1. Definition of Business Units:      Hospital Beds
2. Threshold Business Units Amount:   8,883
3. Dollars per Excess Business Unit Amount: $■■■ Per Bed

**MAX RE LTD.**

By: _Michael S. Morgan_

Title: Senior Vice President

Date: December 11, 2006

MAX-OCR



| Insured: | **Universal Health Services, Inc.** |
|---|---|
| Policy No. | **10658-1095-UMB-2006** |
| Endorsement No: | **22** |
| Effective Date: | **January 1, 2006** |

## CHANGE OF POLICY NUMBER ENDORSEMENT

Immediately prior to the above Effective Date ("Effective Date"), this Policy had the Policy Number set forth in Item 1 below ("Old Policy Number"). As of the Effective Date, pursuant to Article VI, Condition Q of this Policy and the Coverage "A" Extension And Incorporation Of Schedules By Reference Endorsement with the same Effective Date, Coverage A of this Policy was extended for another Annual Period and this Policy was assigned the "Policy No." set forth above as a new Policy Number ("New Policy Number").

This Endorsement has been issued solely for the purpose set forth in the preceding paragraph and nothing in this Endorsement shall create any coverage that would not exist if the Old Policy Number had continued as the Policy Number of this Policy.

Item 1:     Old Policy Number: **6049-572-UMB-2005**

**MAX RE LTD.**

By: _Michael S. Morgan_

Title:   Senior Vice President

Date:   December 11, 2006

**MAX-OCR**

 **MaxRe**

Page 1 of 2

Insured:                   **Universal Health Services, Inc.**
Policy No.                 **10658-1095-UMB-2006**
Endorsement No:            **23**
Effective Date:            **January 1, 2006**

## COVERAGE "A" EXTENSION AND INCORPORATION OF SCHEDULES BY REFERENCE ENDORSEMENT

1.  In consideration of the additional premium stated below, it is hereby agreed that Coverage A of the Policy is extended for another **Annual Period** commencing at 12:01 A.M. prevailing time at the address of the **Named Insured** on the Extension Date listed below. Except if a Change of Limit and/or Retention Endorsement is issued and as indicated on any such endorsement, all other limitations, terms, exclusions and conditions of the Policy remain unchanged, including, without limitation, paragraph (1) of Article VI. R regarding automatic reinstatement of the aggregate limit of liability set forth in Item 2(b) of the Declarations.

2.  Schedules A, B and C dated as of the date(s) listed below are hereby incorporated by reference and shall be deemed to be attached to the Policy; provided, however, that if the **Named Insured** has not provided an up-to-date Schedule B prior to the issuance of this Endorsement, (i) the **Named Insured** covenants to provide such an updated Schedule B, completed in accordance with applicable instructions, as soon as is practicable, which schedule automatically shall be incorporated by reference and deemed to be attached to the Policy, and (ii) the **Named Insured** warrants and represents that it has arranged for replacement insurance (excess but not primary) with coverage at least as broad and limits at least as great as the insurance listed on the most recent Schedule B supplied to the **Company** in respect of this Policy and covenants that such replacement insurance will be listed on the updated Schedule B to be provided as set forth above.

Additional Premium:    $▇▇▇▇▇

Extension Date:        January 1, 2006

Schedule A Date:       October 1, 2005

Schedule B Date:       October 1, 2005

Schedule C Date:       October 1, 2005

MAX-OCR

Insured:            **Universal Health Services, Inc.**
Policy No.          **10658-1095-UMB-2006**
Endorsement No:     **23**
Effective Date:     **January 1, 2006**

---

## COVERAGE "A" EXTENSION AND INCORPORATION OF SCHEDULES
## BY REFERENCE ENDORSEMENT CONT'D.

It is agreed that the only purposes of Schedules A, B and C are to set forth the following information as respects the corresponding indicated provisions of the Policy, and nothing contained in such Schedules shall affect application of any other provisions of the Policy:

| Schedule | Information | Policy Provision |
|----------|-------------|------------------|
| A | additional insured entities | IILP (2) (b) |
| B | underlying insurance | ILA (1) |
| C | exceptions to Watercraft exclusion | IV.J |

**MAX RE LTD.**

By: _____
     Michael S. Morgan

Title:   Senior Vice President

Date:   December 11, 2006

MAX-OCR

 **MaxRe**

| | |
|---|---|
| Insured: | Universal Health Services, Inc. |
| Policy No. | 10658-1095-UMB-2006 |
| Endorsement No: | 24 |
| Effective Date: | January 1, 2006 |

---

### CHANGE OF LIMIT, RETENTION AND/OR RETROACTIVE DATE ENDORSEMENT

1.  It is hereby agreed that, in consideration of the premium (or premium refund) stated below, as of the effective date listed above ("Effective Date"), Items 2 (a) and (b) and 4 of the Declarations shall be amended as indicated below:

    **Item 2  Limits of Liability:**

    (a)

    | Layer | Per Occurrence Limit | | Per Occurrence Retention |
    |---|---|---|---|
    | 1 | 90% part of $20,000,000 | excess of | $25,000,000 |

    (b)

    | Layer | Annual Aggregate: |
    |---|---|
    | 1 | $18,000,000 |

    **Item 4 Retroactive Coverage Date:**

    | | Layer | Effective Date |
    |---|---|---|
    | January 1, 2003 | 90% Part of $20,000,000 xs $25,000,000 | January 1, 2004 |

2.  The coverage in any layer added pursuant to paragraph 1 above shall not apply as respects any Occurrence (including any Integrated Occurrence) which encompasses actual or alleged Personal Injury, Property Damage or Advertising Liability included in any occurrence or Occurrence or claim of which notice was given prior to the Effective Date to (i) the Company, or (ii) any other insurer which provided coverage at the time of such notice within the same layer as is added pursuant to paragraph 1; provided, however, that:

    (a)  prior notice to the Company of an occurrence or an Occurrence which was not a batch occurrence or an Integrated Occurrence shall not limit coverage pursuant to this paragraph 2 as respects an Integrated Occurrence which includes Personal Injury, Property Damage or Advertising Liability both included and not included within such previously noticed occurrence or Occurrence;

Cont'd...

Insured:          **Universal Health Services, Inc.**
Policy No.       **10658-1095-UMB-2006**
Endorsement No:  **24**
Effective Date:    **January 1, 2006**

---

## CHANGE OF LIMIT, RETENTION AND/OR RETROACTIVE DATE ENDORSEMENT

(b)    prior notice to an insurer other than the Company shall not limit coverage pursuant to this paragraph 2 as respects an Integrated Occurrence, but there shall be no coverage in the added layer for Personal Injury, Property Damage or Advertising Liability which is treated by the policy of such other insurer as included within the occurrence or claim notified thereunder (or which would have been so included but for the application of time limitations in such policy) or which is otherwise subject to coverage under such policy (or would be subject to coverage but for exhaustion of, or inability to collect, the limits thereunder).

Nothing in this paragraph 2 shall limit the application of any provision of the Policy, including, without limitation, Article II.B and Definitions III.L and III.M, as respects the coverage in such added layer.

3.    If (a) the Effective Date is not the same as the commencement of an Annual Period, and (b) the Company is first sent notices of different Occurrences within the same Annual Period both before and after the Effective Date, then, subject to all other limitations, terms, exclusions and conditions of the Policy, each such Occurrence shall be subject to the per Occurrence limit, aggregate limit and per Occurrence retention amount listed in Items 2 (a) and (b) of the Declarations as in effect at the time notice of such Occurrence was first given pursuant to Article V.D of the Policy; provided, however, that the aggregate limit of liability stated in Item 2 (b) of the Declarations shall apply with respect to the entire Annual Period, and if such limit is increased or decreased by this Endorsement, the aggregate limits within the Annual Period shall not be cumulative and the lower limit shall be included within the higher limit, i.e., the Occurrences of which notice was first given during the portion of the period in which the lower limit was in effect shall be subject to such limit, and additionally all Occurrences of which notice was first given during the entire Annual Period shall be subject to the higher limit.

4.    The Company in its discretion may permit the Named Insured to purchase as of the Effective Date Coverage B in accordance with Schedule D based on the last Annual Period premium (and prorated for the balance of an Annual Period if the Effective Date is in the middle thereof) in respect of any layer for which coverage is discontinued pursuant to this Endorsement; provided, however, that notwithstanding any other provision of the Policy or this Endorsement, all Occurrences under Coverage A and Coverage B combined shall be subject to the Annual Period aggregate limit stated in Item 2 (b) of the Declarations (as amended herein, if applicable, and, in such case, in accordance with Paragraph 3 above); e.g., if the Named Insured changes Coverage A from $25 million per Occurrence and in the aggregate excess of $50 million to $25 million per Occurrence excess of $75 million and buys Coverage B with respect to the layer $25 million excess of $50 million, then, unless the aggregate limit in Item 2 (b) of the Declarations is increased at the same time, a subsequent Occurrence for which coverage is available under both Coverages A and B would nonetheless be subject to the $25 million aggregate limit notwithstanding that $50 million per Occurrence coverage nominally would apply.

MAX-OCR

Page 3 of 3

Insured:          **Universal Health Services, Inc.**
Policy No.        **10658-1095-UMB-2006**
Endorsement No:   **24**
Effective Date:    **January 1, 2006**

### Coverage B for Discontinued Layer(s)

(a)   Limit in respect of each Occurrence or Claim:     **NA**

(b)   Per Occurrence Retention Amount:     **NA**

(c)   Premium for discontinued layer(s) for **Annual Period**
commencing immediately prior to Effective Date (for
purpose of calculating future Coverage B premium):     **NA**

**Premium**

Additional premium (refund) for limit(s)
/retention(s) /retroactive date change(s)
under paragraph 1:     **See Endorsement No. 23**

Coverage B premium under paragraph 4:     **NA**

**MAX RE LTD.**

By:   ~~Elizabeth Hartley~~

Title:   **Vice President**

Date:   December 11, 2006

**MAX-OCR**

**MaxRe**

Insured:            **Universal Health Services, Inc.**
Policy No.          **10658-1095-UMB-2006**
Endorsement No:     **25**
Effective Date:     **January 1, 2006**

## ENDORSEMENT AS RESPECTS PREMIUM

The **Named Insured** has paid a deposit premium of $▮▮▮▮▮ However, the **Named Insured** shall pay a **Policy Period** total premium ("**Total Premium**"), determined as provided below.

The **Total Premium** shall be determined as follows:

(A)   The **minimum premium for the policy period is** $▮▮▮▮ ("**Minimum Premium**"), and the **maximum premium for the policy period is** $▮▮▮▮ ("**Maximum Premium**"). Subject always to being not less than the **Minimum Premium** and not more than the **Maximum Premium**, the **Total Premium** for the **Policy Period** shall be calculated as follows: (a) all **Ultimate Net Loss** (net of subrogation recoveries (after deducting expenses); hereinafter "**Recoveries**") that the **Company** incurs as respects the **Policy Period** ("**Total Ultimate Net Loss Amount**") multiplied by 100/75 (1.333) equals the **Total Premium** payable to the **Company** ("**Total Calculated Premium**").

(B)   The premium calculation shall occur as follows:

  (i)   The determination of the **Total Ultimate Net Loss** Amount and the **Total Calculated Premium** shall not terminate at the end of the **Policy Period** (whether due to expiration, cancellation or otherwise, unless otherwise agreed in writing by the parties), but shall continue as respects any **Ultimate Net Loss** incurred or **Recoveries** received thereafter.

  (ii)   As of the first one-year anniversary of the termination of the **Policy Period**, the **Company** shall determine the **Total Calculated Premium** then due for the **Policy Period** as set forth in paragraph (a) above. Subject always to the **Minimum Premium** and **Maximum Premium**, if the **Total Calculated Premium** exceeds the current balance of the premium previously paid ("**Current Balance**"), the **Named Insured** shall pay to the **Company** the amount of the difference within ten (10) days of receipt of notice thereof and if the **Current Balance** exceeds the **Total Calculated Premium**, subject to the provisions of subparagraph (b)(iv) below, the **Company** shall pay the amount of the difference to **Named Insured** within ten (10) days of the determination thereof. The **Company** shall make the determination set forth in this subparagraph (b)(ii), and all subsequent determinations set forth in paragraph (b)(iif) below, within 30 days after the respective anniversary.

MAX OCR

| | | |
|---|---|---|
| Insured: | **Universal Health Services, Inc.** | Page 2 of 3 |
| Policy No. | **10658-1095-UMB-2006** | |
| Endorsement No: | **25** | |
| Effective Date: | **January 1, 2006** | |

## ENDORSEMENT AS RESPECTS PREMIUM

(iii)  As of each anniversary after the first anniversary of the termination of the **Policy Period**, continuing until the **Company** and the **Named Insured** agree in writing that there is no further need to so, subject always to the Minimum Premium and Maximum Premium, the **Company** shall determine whether the Total Calculated Premium has increased or decreased from its immediately preceding anniversary calculation, by applying the calculation set forth in paragraph (a) above to the Total Ultimate Net Loss Amount after adding thereto any Ultimate Net Loss paid by the **Company** and subtracting therefrom any Recoveries received by the **Company** during the preceding one-year period.  On the same time schedule set forth in subparagraph (b)(ii), and taking into account payments by offset as set forth in subparagraph (b)(iv) below, the **Named Insured** shall pay the **Company** the amount of any increase or the **Company** shall pay the **Named Insured** the amount of any decrease.

(iv)  As respects any amounts due by the **Company** to the **Named Insured** pursuant to subparagraph (b)(ii) or (iii), or for Ultimate Net Loss payable under this Policy after termination of the **Policy Period**, the **Company** may offset such amounts from any amounts then due, or subject to become due, to the **Named Insured** under this Policy.  Without limiting the foregoing, the **Company** may offset from the payment of Ultimate Net Loss due the Insured, but subject to not exceeding the Maximum Premium, any increase in premium resulting from such Ultimate Net Loss.  (For example, if the Maximum Premium were $2,000,000 and if there is $3,000,000 of Ultimate Net Loss due from the **Company** to the **Insured** as respects an Occurrence, and assuming as of that time the Current Balance of premium paid is $1,400,000, the formula set forth in paragraph (a) would result in an additional premium of $600,000 (the difference between $1,400,000 and $2,000,000 Maximum Premium) and the **Company** would offset that against the $3,000,000, thus paying the Insured $2,400,000.)

(C)  Notwithstanding the provision of Condition L of this Policy that Coverage A under the Policy may be cancelled on a *pro rata* basis, if the **Named Insured** cancels this Policy, earned premium will be the greater of (i) the amount computed in accordance with the customary pro-rata rate table and procedure or (ii) the Minimum Premium stated in paragraph (a) above.

**MAX OCR**

| Insured: | Universal Health Services, Inc. | Page 3 of 3 |
|---|---|---|
| Policy No. | 10658-1095-UMB-2006 | |
| Endorsement No: | 25 | |
| Effective Date: | January 1, 2006 | |

All other terms and conditions of this Policy remain unchanged.

MAX RE LTD.

By: _____

Michael S. Morgan

Title:   Senior Vice President

Date:   December 11, 2006

MAX OCR

 **MaxRe**

Insured:              Universal Health Services, Inc.
Policy No.            10658-1095-UMB-2006
Endorsement No:      26
Effective Date:      January 1, 2006

## SPECIAL RISKS MULTIPLE RETENTION ENDORSEMENT

1.    With respect to the specific risk(s) described below, it is agreed that the Per Occurrence Retention Amount set forth in Item 2(a) of the Declarations shall be amended to be the amounts respectively set forth with respect thereto;  provided, however, that all other declarations, provisions, stipulations, exclusions and conditions of the Policy shall remain in effect;  provided further, that the Per Occurrence Retention Amount set forth in Item 2(a) of the Declarations shall not be affected by this Endorsement except as to the specific risks listed below.

2.    Where different Per Occurrence Retention Amounts apply to different elements of Personal Injury, Property Damage and/or Advertising Liability arising out of a single Occurrence, Ultimate Net Loss (but only to the extent not paid or indemnified under the Policy) which is subject to one Per Occurrence Retention Amount shall also erode any equal or higher Per Occurrence Retention Amount(s), but Ultimate Net Loss which is subject to a higher Per Occurrence Retention Amount shall not erode a lower Per Occurrence Retention Amount; i.e., the Per Occurrence Retention Amounts are not cumulative under Article II.A(2) of the Policy as respects a single Occurrence, but no recovery may be had with respect to any specific risk until the Insured (and/or the Insured's underlying insurers) has satisfied the full Per Occurrence Retention Amount with respect thereto by actual payment of Ultimate Net Loss.

3.    Nothing herein shall affect the application of the Policy as excess of all underlying insurances; without limiting the foregoing, where separate underlying insurances apply in respect to a single Occurrence, this Policy shall be excess of the cumulative coverage thereunder as provided in Articles II.A(1) and VI.H of the Policy.

4.    This Endorsement applies to all Occurrences with respect to which notice of Occurrence or Claim is given to the Company on or after the Effective Date shown above notwithstanding that the event or conditions commenced or the Personal Injury or Property Damage took place in whole or in part prior to the Effective Date.

**SPECIFIC RISK(S):     Non-Professional Liability**

**AMENDED PER OCCURRENCE RETENTION AMOUNT(S): $15,000,000**

Insured:              Universal Health Services, Inc.
Policy No.            10658-1095-UMB-2006
Endorsement No:       26
Effective Date:       January 1, 2006

## SPECIAL RISKS MULTIPLE RETENTION ENDORSEMENT

Solely for the purposes of this Endorsement, the following definition(s) shall apply:

"Non-Professional Liability" means any Ultimate Net Loss that is not "Professional Liability" Ultimate Net Loss; i.e., all Ultimate Net Loss covered by this Policy (including the Endorsements thereto), except for Ultimate Net Loss that is "Professional Liability" Ultimate Net Loss.

"Professional Liability" means only liability, to the extent covered pursuant to the terms, conditions and exclusions of this Policy, that arises from Bodily Injury to current patients of hospitals, and/or other facilities covered by this Policy.

MAX RE LTD.

By: _____
    Michael S. Morgan

Title:   Senior Vice President

Date:    December 11, 2006

 **MaxRe**

Insured:               **Universal Health Services, Inc.**
Policy No.             **10658-1095-UMB-2006**
Endorsement No:        **27**
Effective Date:        **January 1, 2006**

## PREMIUM ADJUSTMENT ENDORSEMENT

It is hereby agreed by and between the Company and the Named Insured as of the above Effective Date ("Effective Date"):

As respects each **Annual Period**, the premium set forth in Item 7 of the Declarations ("**Annual Period Premium**") is not subject to adjustment, except in any instance where the total Business Units (as defined below) of the Named Insured (and all consolidated subsidiaries and affiliates) ("**Total Business Units**") for such **Annual Period** exceeds the Threshold Business Unit Amount set forth in Item 2 below; in such case, the **Company** in its discretion may impose an additional premium equal to the product of (i) the number of Business Units by which the Total Business Units exceeds the Threshold Business Units Amount times (ii) the Dollars Per Excess Business Unit Amount set forth in Item 3 below (for example, if the Threshold Business Units Amount is 1,000, the Total Business Units is 1,100, and the Dollar Per Excess Business Unit Amount is $100, then the additional premium is calculated as follows: 1,100-1,000 = 100 x $100 = $10,000). The foregoing calculation shall be made for each **Annual Period** in which the Total Business Units exceeds the Threshold Business Units Amount, always using the same Threshold Business Units Amount. Any additional premium shall be paid as follows: (a) if the increase is due to an acquisition, merger or similar transaction (collectively, "Acquisition"), the Named Insured shall inform the Company at or prior to the Acquisition of its best estimate of the increase in Total Business Units expected from such Acquisition, and, as respects the **Annual Period** in which such Acquisition occurs, shall pay the additional premium within 10 days after notification of the amount thereof by the Company (after the end of such **Annual Period**, if necessary, an adjustment will be made to reflect any difference between the expected and actual increase due to the Acquisition), and (b) as respects each **Annual Period** (including one in which (a) applies), the Named Insured, on or prior to the end thereof, shall inform the Company of its best estimate of the Total Business Units (including those attributable to an Acquisition(s)) and shall pay any additional premium due within the later of 30 days after the end of such **Annual Period** or 10 days after notification of the amount thereof by the Company (any change in additional premium resulting from a difference between the estimates and the actual figures when finally determined shall be adjusted between the Named Insured and the Company within 10 days after the determination thereof).

### Definition of Total Business Units

"Business Units" are as defined in Item 1 below. The basis of determining the Total Business Units for each **Annual Period** (e.g., average daily basis, for the entire **Annual Period**, etc.) shall be included in the Item 1 definition.

**MAX-OCR**

Insured:                Universal Health Services, Inc.
Policy No.              10658-1095-UMB-2006
Endorsement No:         27
Effective Date:         January 1, 2006

---

## PREMIUM ADJUSTMENT ENDORSEMENT

Items:  1. Definition of Business Units:            Hospital Beds
        2. Threshold Business Units Amount:        8,883
        3. Dollars per Excess Business Unit Amount:  $▓▓▓▓▓▓ Bed

**MAX RE LTD.**

By: _____
    Michael S. Morgan

Title:  Senior Vice President

Date:   December 11, 2006

**MAX-OCR**



Insured:              **Universal Health Services, Inc.**
Policy No.            **10658-1095-UMB-2006**
Endorsement No:      **28**
Effective Date:      **January 1, 2006**

## SEVERAL LIABILITY FOR QUOTA SHARE COVERAGE

In consideration of the premium charged, it is agreed that the Company's liability for **Ultimate Net Loss** under this Policy is solely for its proportionate or quota share of the applicable limits of liability as set forth in Item 2 of the Declarations. Further, the Company's liability is several and not joint, and, in no event shall the Company be liable for the proportionate or quota share of any other insurer or entity participating on the same layer of coverage as this Policy.

All other terms and conditions of this Policy remain unchanged,

**MAX RE LTD.**

By: _____
    Michael S. Morgan

Title: Senior Vice President

Date: December 11, 2006

**MAX-OCR**

**MaxRe**

| | |
|---|---|
| Insured: | **Universal Health Services, Inc.** |
| Policy No. | **10658-1095-UMB-2006** |
| Endorsement No: | **29** |
| Effective Date: | **January 1, 2006** |

### THIS ENDORSEMENT CANCELS AND REPLACES ENDORSEMENT NO. 21
### WARRANTY OF UNDERLYING INSURANCE WITH LIMITED DROP-DOWN
### (SPECIFIC COVERAGES) ENDORSEMENT

1.   The Named Insured represents and warrants that the Policy applies excess of underlying insurance set forth in Exhibit 1 hereto.

2.   With respect to each of the underlying coverages listed in Exhibit 1, if and only to the extent that the aggregate limits thereof have been eroded or exhausted by actual payment of loss, the Per Occurrence Retention amount set forth in Item 2(a) of the Declarations for any Occurrence which is covered both by such underlying coverage (or would be covered thereunder but for the exhaustion of the aggregate limit thereof by actual payment of loss) and by the Policy shall be amended to be the greater of the underlying aggregate limits as so reduced or the Minimum Per Occurrence Retention Amount set forth below; provided, however, nothing in this Endorsement shall make the Policy subject to the terms and conditions of any underlying coverage or shall otherwise expand or alter the scope of coverage of the Policy; provided further that in any instance where the coverage of the Policy is broader than the underlying coverages, the Per Occurrence Retention amount set forth in Item 2(a) of the Declarations shall not be reduced by this Endorsement.

3.   Other than where the aggregate limits of the underlying insurances have been eroded or exhausted by the actual payment of loss, the Policy shall not drop down below the level of the Per Occurrence Retention amount previously listed in Item 2(a) of the Declarations (i.e., without giving effect to the operation of paragraph 2 above) for any reason, including, without limitation, absence of coverages for an Occurrence under any of the underlying policies (i.e., this endorsement does not provide difference-in-conditions coverage), insolvency of the underlying insurer, unwillingness to pay by the underlying insurer, cancellation or expiration of the underlying insurance, failure by the Insured to satisfy any condition of any underlying policy, etc.

4.   The Named Insured represents and warrants that as of the effective date hereof there has been no erosion of the aggregate limits of the insurance set forth in Exhibit 1 hereto and there are no known Occurrences or Claims which it is reasonably anticipated will cause such erosion, except as set forth in the attached Exhibit 2.

Cont'd.... ...

MAX-OCR

Insured:          **Universal Health Services, Inc.**
Policy No.        **10658-1095-UMB-2006**
Endorsement No:   **29**
Effective Date:   **January 1, 2006**

---

### THIS ENDORSEMENT CANCELS AND REPLACES ENDORSEMENT NO. 21
### WARRANTY OF UNDERLYING INSURANCE WITH LIMITED DROP-DOWN
### (SPECIFIC COVERAGES) ENDORSEMENT

5.    With respect to any loss which is covered by the underlying policies listed on Exhibit 1 hereto but would not be covered under the Policy even if the amount thereof exceeded the Per Occurrence Retention amount, the Insured, as a condition precedent to the application of this Endorsement, shall give notice pursuant to Article V of the Policy in all respects as if such loss were in respect of an Occurrence covered under the Policy.


**Minimum Per Occurrence Retention Amount:**

Non-Professional Liability        **$15,000,000**

Professional Liability:           **$5M/$5M buffer excess of $15,000,000**

Integrated Occurrence:            **$25,000,000**


**MAX RE LTD.**

By:    _Michael S. Morgan_

Title:   Senior Vice President

Date:    December 11, 2006

**MAX-OCR**

Insured:            **Universal Health Services, Inc.**
Policy No.           **10658-1095-UMB-2006**
Endorsement No:      **29**
Effective Date:      **January 1, 2006**

### EXHIBIT 1, PAGE 2

UNDERLYING COVERAGE:

PROFESSIONAL LIABILITY

| LIMIT | RETENTION/ UNDERLYING AMOUNT | INSURER(S) | POLICY PERIOD |
|---|---|---|---|
| $5M per occurrence/$5M aggregate | $5M per occurrence/$5M aggregate Buffer excess of $15M | Max Re Ltd./SIR | January 1, 2006-2007 |
| $5M per occurrence/$5M aggregate | $15M Each & Every | Buffer and SIR | January 1, 2006-2007 |

UNDERLYING COVERAGE:

NON-PROFESSIONAL LIABILITY

| LIMIT | RETENTION/ UNDERLYING AMOUNT | INSURER(S) | POLICY PERIOD |
|---|---|---|---|
| $5M per occurrence/$5M aggregate | $15M Each & Every | Max Re Ltd./SIR | January 1, 2006-2007 |

MAX-OCR

Insured: **Universal Health Services, Inc.**
Policy No. **10658-1095-UMB-2006**
Endorsement No: **29**
Effective Date: **January 1, 2006**

## EXHIBIT 1, PAGE 2

| LIMIT | RETENTION/ UNDERLYING AMOUNT | INSURER(S) | POLICY PERIOD |
| --- | --- | --- | --- |

**MAX-OCR**



Insured:            Universal Health Services, Inc.
Policy No.          10658-1095-UMB-2006
Endorsement No:     29
Effective Date:     January 1, 2006

## EXHIBIT 2

| CLAIMANT(S) | DESCRIPTION OF CLAIM | AMOUNT PAID TO DATE | | ESTIMATED MAXIMUM EXPOSURE | UNDERLYING POLICY PERIOD(S) IMPLICATED |
|---|---|---|---|---|---|
| | | DEFENSE | INDEMNITY | | |
| NONE | | | | | |

MAX-OCR



| | |
|---|---|
| Insured: | **Universal Health Services, Inc.** |
| Policy No. | **10658-1095-UMB-2006** |
| Endorsement No: | **30** |
| Effective Date: | **January 1, 2006** |

## ACQUIRED ENTITY RETROACTIVE COVERAGE ENDORSEMENT

As of the Effective Date above it is hereby agreed that the acquired entity(ies) listed below shall be an Insured(s) under the Policy. With respect to any Occurrence giving rise to liability of such an Insured (or any other party becoming an Insured by virtue of such an Insured becoming an Insured pursuant to this Endorsement), the Retroactive Coverage Date shall be the Retroactive Coverage Date shown below.

In consideration of such retroactive coverage, it is a condition precedent to the rights of such an Insured (or any other party becoming an Insured by virtue of such Insured becoming an Insured pursuant to this Endorsement) under the Policy with respect to any Occurrence that no Insured under the Policy was aware of such Occurrence at the Effective Date of this Endorsement.

An Insured shall be deemed to have been aware of an Occurrence if any Executive Officer was aware, in the case of an Occurrence under subparagraph (1)(a) of Definition V, of any of the event, exposure to conditions, Personal Injury, Property Damage or Advertising Liability as respects such Occurrence or, in the case of subparagraph (1)(b) of such Definition, of any of the Personal Injury or Property Damage as respects such Occurrence, in each case irrespective of whether or not the Insured was aware that such Occurrence was likely to involve the Policy.

All terms, conditions, exclusions and limitations of the Policy shall apply to such Insured(s), including without limitation, Article II.D.

| | |
|---|---|
| **Acquired Entity(ies):** | **The Keys Group** |
| **Additional Premium:** | **Included in January 1, 2006 renewal premium** |
| **Retroactive Coverage Date:** | April 30, 2003 |

MAX RE LTD.

By: _(signature)_
Michael S. Morgan

Title:   Senior Vice President

Date:   December 11, 2006

MAX-OCR

 **MaxRe**

Insured:                Universal Health Services, Inc.
Policy No.              10658-1095-UMB-2006
Endorsement No:         31
Effective Date:         January 1, 2004

---

**THIS ENDORSEMENT REPLACES ENDORSEMENT NO. 6 DATED MARCH 3, 2004
EFFECTIVE JANUARY 1, 2006**

**RETROACTIVE COVERAGE ENDORSEMENT**

It is hereby agreed that the Retroactive Coverage Date for the layers:

Professional Liability- 90% Part of  $20,000,000 excess of  $25,000,000 is January 1, 2003
Non-Professional Liability- 90% Part of  $20,000,000 excess of  $15,000,000 is January 1, 2003

and such retroactive coverage became effective at the Effective Date listed above ("Effective Date").

It is a condition precedent to the rights of any Insured under this Policy with respect to any Occurrence in such layer as respects such retroactive coverage (i.e., Personal Injury, Property Damage and/or Advertising Liability taking place prior to the Effective Date) that, except as specifically agreed to in writing by the Company and the Named Insured, the Named Insured was not aware of such Occurrence at the Effective Date. The Named Insured shall be deemed to have been aware of an Occurrence if any Executive Officer was aware, in the case of an Occurrence under subparagraph (a) of paragraph (1) of Section (V) of Article III, of any of the event, exposure to conditions, Personal Injury, Property Damage or Advertising Liability as respects such Occurrence or, in the case of subparagraph (b) of such paragraph, of any of the Personal Injury or Property Damage as respects such Occurrence, in each case irrespective of whether or not such person was aware that such Occurrence was likely to involve this Policy.

It is hereby agreed that the extension of coverage pursuant to this Endorsement shall not apply to, and the Company shall have no liability hereunder to the Insured in respect of, any Personal Injury, Property Damage or Advertising Liability arising out of the products, services, operations, activities, risks, defects, hazards, alleged defects or hazards, failure to warn of any of the foregoing, and/or any other matter, described below:

1)    Employer's liability (whether under workers' compensation laws or otherwise) as respects personal injury at any time arising out of the course of employment prior to the Inception date of this Coverage of any employee of the Insured.

2)    Any repetitive motion, repetitive stress, repetitive strain or cumulative trauma disorder, including, without limitation, (i) liability or alleged liability arising from asserted improper design of goods, equipment, machinery or operations, (ii) failure to warn or properly instruct as to use of goods, equipment or machinery or conduct of operations, (iii) improper supervision of use of goods, equipment or machinery or conduct of operations, or (iv) without limiting the foregoing, carpal tunnel syndrome arising or allegedly arising from use of keyboards or finger pads.

Insured:            **Universal Health Services, Inc.**
Policy No.          **10658-1095-UMB-2006**
Endorsement No:     **31**
Effective Date:     **January 1, 2004**

---

### THIS ENDORSEMENT REPLACES ENDORSEMENT NO. 6 DATED MARCH 3, 2004
### EFFECTIVE JANUARY 1, 2006

### RETROACTIVE COVERAGE ENDORSEMENT (CONT'D)

3)    Any liability in respect of personal injury or alleged personal injury (including, without limitation, fear or anxiety claims) or advertising liability arising out of any product consisting in whole or in part of silicone (liquid, gel, solid or in any other form) used for implantation or injection into the human body or any liability otherwise arising out of or related to medical or cosmetic internal use in humans of silicone.

**MAX RE LTD.**

By: _____
    Michael Morgan

Title:   Senior Vice President

Date:    December 11, 2006


**MaxRe**

Insured:            **Universal Health Services, Inc.**
Policy No.          **10658-1095-UMB-2006**
Endorsement No:     **32**
Effective Date:     **January 1, 2004**

## CANCELLATION OF ENDORSEMENT NO. 16 AND ENDORSEMENT NO. 18

It is understood and agreed that the **Previously Notified Occurrences or Claims And/Or Known Occurrences Exclusion** endorsement and **Retroactive Coverage** endorsement dated **April 25, 2005** and also attached to this Policy is hereby cancelled and revoked as of the Effective Date shown above.

MAX RE LTD.

By:  _Michael S. Morgan_
     Michael S. Morgan

Title:   Senior Vice President

Date:    December 11, 2006

MAX-OCR

 **MaxBermuda**

Page 1 of 5

Insured:        **Universal Health Services, Inc.**
Policy No.      **10658-1095-UMB-2006**
Endorsement No:    **37**
Effective Date:    **January 1, 2006**

---

### THIS ENDORSEMENT CANCELS AND REPLACES ENDORSEMENT NO. 29
### WARRANTY OF UNDERLYING INSURANCE WITH LIMITED DROP-DOWN
### (SPECIFIC COVERAGES) ENDORSEMENT

1. The Named Insured represents and warrants that the Policy applies excess of underlying insurance set forth in Exhibit 1 hereto.

2. With respect to each of the underlying coverages listed in Exhibit 1, if and only to the extent that the aggregate limits thereof have been eroded or exhausted by actual payment of loss, the Per Occurrence Retention amount set forth in Item 2(a) of the Declarations for any Occurrence which is covered both by such underlying coverage (or would be covered thereunder but for the exhaustion of the aggregate limit thereof by actual payment of loss) and by the Policy shall be amended to be the greater of the underlying aggregate limits as so reduced or the Minimum Per Occurrence Retention Amount set forth below; provided, however, nothing in this Endorsement shall make the Policy subject to the terms and conditions of any underlying coverage or shall otherwise expand or alter the scope of coverage of the Policy; provided further that in any instance where the coverage of the Policy is broader than the underlying coverages, the Per Occurrence Retention amount set forth in Item 2(a) of the Declarations shall not be reduced by this Endorsement.

3. Other than where the aggregate limits of the underlying insurances have been eroded or exhausted by the actual payment of loss, the Policy shall not drop down below the level of the Per Occurrence Retention amount previously listed in Item 2(a) of the Declarations (i.e., without giving effect to the operation of paragraph 2 above) for any reason, including, without limitation, absence of coverages for an Occurrence under any of the underlying policies (i.e., this endorsement does not provide difference-in-conditions coverage), insolvency of the underlying insurer, unwillingness to pay by the underlying insurer, cancellation or expiration of the underlying insurance, failure by the Insured to satisfy any condition of any underlying policy, etc.

4. The Named Insured represents and warrants that as of the effective date hereof there has been no erosion of the aggregate limits of the insurance set forth in Exhibit 1 hereto and there are no known Occurrences or Claims which it is reasonably anticipated will cause such erosion, except as set forth in the attached Exhibit 2.

Cont'd...

MAX-OCR

Insured:          Universal Health Services, Inc.                Page 2 of 5
Policy No.        10658-1095-UMB-2006
Endorsement No:   37
Effective Date:   January 1, 2006

---

**THIS ENDORSEMENT CANCELS AND REPLACES ENDORSEMENT NO. 21
WARRANTY OF UNDERLYING INSURANCE WITH LIMITED DROP-DOWN
(SPECIFIC COVERAGES) ENDORSEMENT**

5.   With respect to any loss which is covered by the underlying policies listed on Exhibit 1 hereto but
     would not be covered under the Policy even if the amount thereof exceeded the Per Occurrence
     Retention amount, the Insured, as a condition precedent to the application of this Endorsement, shall
     give notice pursuant to Article V of the Policy in all respects as if such loss were in respect of an
     Occurrence covered under the Policy.


Minimum Per Occurrence Retention Amount:

Non-Professional Liability     $15,000,000

Professional Liability:        $15,000,000

Integrated Occurrence:         $25,000,000


MAX RE LTD.

By:   _____
      Michael S. Morgan

Title:   Senior Vice President

Date:    July 10, 2007


MAX-OCR



Page 3 of 5

Insured:              **Universal Health Services, Inc.**
Policy No.           **10658-1095-UMB-2006**
Endorsement No:      **37**
Effective Date:      **January 1, 2006**

---

### EXHIBIT 1, PAGE 1

UNDERLYING COVERAGE:

PROFESSIONAL LIABILITY

| LIMIT | RETENTION/ UNDERLYING AMOUNT | INSURER(S) | POLICY PERIOD |
|---|---|---|---|
| $5M per occurrence/$5M aggregate | $5M per occurrence/$5M aggregate Buffer excess of $15M | Max Re Ltd./SIR | January 1, 2006-2007 |
| $5M per occurrence/$5M aggregate | $15M Each & Every | Buffer and SIR | January 1, 2006-2007 |

UNDERLYING COVERAGE:

NON-PROFESSIONAL LIABILITY

| LIMIT | RETENTION/ UNDERLYING AMOUNT | INSURER(S) | POLICY PERIOD |
|---|---|---|---|
| $5M per occurrence/$5M aggregate | $15M Each & Every | Max Re Ltd./SIR | January 1, 2006-2007 |

MAX-OCR

Insured:            Universal Health Services, Inc.
Policy No.          10658-1095-UMB-2006
Endorsement No:     37
Effective Date:     January 1, 2006

---

**EXHIBIT 1, PAGE 2**

| LIMIT | RETENTION/ UNDERLYING AMOUNT | INSURER(S) | POLICY PERIOD |
|-------|------------------------------|------------|---------------|

MAX-OCR



Page 5 of 5

Insured:           Universal Health Services, Inc.
Policy No.         10658-1095-UMB-2006
Endorsement No:    37
Effective Date:    January 1, 2006

## EXHIBIT 2

| CLAIMANT(S) | DESCRIPTION OF CLAIM | AMOUNT DEFENSE | PAID TO DATE INDEMNITY | ESTIMATED MAXIMUM EXPOSURE | UNDERLYING POLICY PERIOD(S) IMPLICATED |
|---|---|---|---|---|---|
| NONE | | | | | |

MAX-OCR

EXHIBIT C

**H P S** | **Hall Prangle** and **Schoonveld** LLC
Attorneys at Law

777 North Rainbow Boulevard. Suite 225
Las Vegas. Nevada 89107
P 702.889.8400
F 702.384.6025
www.hpslaw.com

David P. Ferrainolo, Esq.
dferrainolo@hpslaw.com
ADMITTED IN NEVADA AND PENNSYLVANIA

June 19, 2008

**Via Facsimile Only**
Nicholas M. Wieczorek, Esq.
MORRIS POLICH & PURDY, LLP
3930 Howard Hughes Pkwy, Ste. 360
Las Vegas, NV 89169

Re:   Shinn v. Baxa

Dear Mr. Wieczorek:

Pursuant to our conversation of today, it is my understanding that the deposition of Custodian of Records of Summerlin Hospital scheduled for July 1, 2008 will be taken off calendar. Also, at this juncture, we do not have to produce the documents requested in your May 19, 2008 correspondence except for the insurance policy for Summerlin Hospital and/or Baxa in effect during the period in question. I am working to get a copy of the insurance policy for Summerlin Hospital and will provide that to you as soon as possible.

This will also confirm that as of today, I received the following deposition notices for: Rezvan Nazanin, Pamela Goff, Gretta Woodington, Jackson Yu, Lupe Kim, Jennifer Kailiuli, and Rebecca Weiss. Although we did not discuss these notices at the time of our phone call, I am assuming that these depositions will not be going forward on July 1st, 2nd and 3rd.

If my understanding is not correct regarding the above, I ask that you please notify me in writing so that I can ensure we are on the same page going forward.

Thank you for your professional courtesy in this matter.

Sincerely,

HALL PRANGLE & SCHOONVELD, LLC

David P. Ferrainolo

DPF/trp

```
*************** -COMM. JOURNAL- ******************** DATE JUN-19-2008 ***** TIME 13:31 ********

          MODE = MEMORY TRANSMISSION              START=JUN-19 13:31      END=JUN-19 13:31

          FILE NO.=728

STN     COMM.       STATION NAME/EMAIL ADDRESS/TELEPHONE NO.      PAGES       DURATION
NO.

001     OK          ☎98628400#8827                               002/002     00:00:27


                                              -HPS VEGAS OFFICE              -

***** KM-F1060 ********************** -HPS VEGAS OFFICE- ***** -      702 384 6025- *********
```

### HALL, PRANGLE & SCHOONVELD, L.L.C.

| 200 S. Wacker Dr., Ste. 3300 | 777 N. Rainbow Blvd., Ste. 225 | 136 E. S. Temple, Ste. 2400 |
|---|---|---|
| Chicago, Illinois 60606 | Las Vegas, NV 89107 | Salt Lake City, Utah 84111 |
| (312) 345-0600 – Office | (702) 889-6400 – Office | (801) 530-9900 – Office |
| (312) 345-9693 – Facsimile | (702) 384-6425 – Facsimile | (801) 530-9906 – Facsimile |

## FAX TRANSMISSION

| TO:  Nicholas Wieczorek, Esq. | FROM:  David P. Ferrainolo, Esq. |
|---|---|
| FAX:  862-6400 | Office No.:  (702) 889-640 |
| Case:  Shiao v. Baxa | |
| Case No.:  88-27 | Date:  06/19/08 |

Message:

| | PLEASE TAKE APPROPRIATE ACTION | | FOR YOUR REVIEW | |
|---|---|---|---|---|
| | PURSUANT TO YOUR REQUEST | X | ORIGINAL WILL NOT FOLLOW IN MAIL | |

If there are any problems with this transmittal, please call (702) 889-6400. Thank you.

Sender:  Tarnie Phillips          Total number of pages, including cover:  2

This facsimile transmission is intended only for the addressee shown below. It may contain information that is privileged, confidential or otherwise protected from disclosure. Any review, dissemination or use of this transmission or its contents by persons other than the addressee is strictly prohibited. If you have received this transmission in error, please notify us immediately by telephone and destroy the original.